Message

| | |
|---|---|
| **From**: | Kevin Yu [kevin.yu93@gmail.com] |
| on behalf of | Kevin Yu <kevin.yu93@gmail.com> [kevin.yu93@gmail.com] |
| **Sent**: | 1/8/2021 7:49:02 PM |
| **To**: | Tony Diab [tony@coastprocessing.com] |
| **Subject**: | Re: Coast-OHP Term Sheet |
| **Attachments**: | 1-7 redline.docx |

Apologies, forgot to pass this along yesterday. See attached for our proposed term sheet redlined to your last draft.

Thanks,



Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


On Thu, Jan 7, 2021 at 3:49 PM Tony Diab <tony@coastprocessing.com> wrote:
  Ok, thanks!  Can we pencil in 1:30 pm Pacific tomorrow?

  Thanks!

On Thu, Jan 7, 2021 at 1:48 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
  Hi Tony,

  We caught up with our counsel, are you free at or after 1 PM PST tomorrow (Friday) to talk with them?

  We are generally okay with most of your changes, but given the carte blanche to operate outside of PurchaseCo, we felt the need to shore up the ROFR. I think it's probably more efficient to keep it small between the lawyers and focus on making sure the legal language is accomplishing our intentions. From an economic perspective, we don't believe we've altered anything and given all of our previous discussions we were cognizant to ensure that:

  1) Everything has a cure period to prevent any "gotchas"
  2) There is no scenario where OHP is entitled to anything beyond the return of our Funding Capital and 30% of remaining equity

  Finishing up a few last edits and will circulate the revisions shortly.

  Thanks,



  Kevin Yu
  kevin.yu93@gmail.com
  (512) 888-8897


EXHIBIT 510

OHPLPG00073114

On Thu, Dec 24, 2020 at 9:32 PM Tony Diab <tony@coastprocessing.com> wrote:
Revision per our conversation.  Please let me know as soon as you speak with your team on the issue we
identified, and then we can set up a call with the group.  Asante and Brian would like to reach a resolution
point as soon as possible.

Thanks!

On Thu, Dec 17, 2020 at 12:11 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Sure. See attached.


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


On Thu, Dec 17, 2020 at 1:43 PM Tony Diab <tony@coastprocessing.com> wrote:
Hi Kevin -

Can you send as a word document, a few proposed revisions.

Thanks!

On Wed, Dec 16, 2020 at 1:54 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least
verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or
concerns.

Thanks,



Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897
--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com



--
Coast Processing
1351 Calle Avanzado
Suite 2

San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com


--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

OHPLPG00073116

Nonbinding Term Sheet

COAST PROCESSING
INDICATIVE SUMMARY OF TERMS AND CONDITIONS

This Indicative Summary of Terms and Conditions is intended only as an outline of certain of the material terms of the proposed operating agreement (the "Operating Agreement") for PurchaseCo, a Delaware limited liability company to be jointly owned and managed by Old Hickory Partners – Coast, L.P. ("OHP") and B.A.T. Inc. dba Coast Processing and its principals Brian Reale, Asante Bayrooti and Mario Azevedo ("Coast," and together with OHP, the "PurchaseCo Parties") and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive documentation for the structure of the Operating Agreement contemplated hereby.

| | |
|---|---|
| **PURCHASECO ENTITY:** | The PurchaseCo Parties will establish PurchaseCo, a Delaware limited liability company to be jointly owned and managed by OHP and Coast for the exclusive purpose of purchasing all future cash flow streams from individual receivables (collectively, "Packages") sourced by Coast and its Affiliates, and to receive cash flows therefrom. |
| **OWNERSHIP:** | Each PurchaseCo Party's respective interest in PurchaseCo ("Ownership Interest") is as follows:<br><br>Coast – 70%<br>OHP – 30% |
| **CAPITALIZATION:** | Prior to commencing operations at PurchaseCo, the PurchaseCo Parties will capitalize PurchaseCo with $300,000.00 of equity, pro rata, according to the Ownership Interests (the "Equity Investment"):<br><br>Coast – $210,000.00<br>OHP – $90,000.00<br><br>One time per month, PurchaseCo can issue an additional capital call request to OHP for the sole purpose of funding the purchase of Eligible Receivables (as hereinafter defined) that PurchaseCo's cash on hand cannot fund (the "Funding Capital"). The PurchaseCo Parties agree that OHP's Ownership Interest in PurchaseCo will not exceed 30%, except in certain circumstances to be described in the Operating Agreement, and is not adjusted by its contributions of Funding Capital.<br><br>OHP's Funding Capital is available over 5 years in the amount of $10 million (the "Commitment"); provided that during the first 6 months starting from the Closing Date (as hereinafter defined), availability of Funding Capital shall be limited to $5 million, and that the first advance of Funding Capital shall be limited to $2 million. Any distributions of Funding Capital to OHP are subject to reinvestment by PurchaseCo to fund additional Eligible Receivables. The Commitment term and size can be increased at OHP's option.<br><br>PurchaseCo's ability to call Funding Capital shall be subject to certain restrictions set forth in the Operating Agreement, including the Cost Basis of Eligible Receivables measured as of the last day of the prior month (the "Funding Base"). The Funding Base as of any date of determination shall be an amount equal to 100% of the Cost Basis of Eligible Receivables. The "Cost Basis" of Eligible Receivables refers to the amount paid to Affiliates for a File (as hereinafter defined) or Packages. For the purposes of calculating the Funding Base, Eligible Receivables shall also include any Files or Packages contracted with Affiliates and approved for purchase by PurchaseCo in the current month. To the extent that the outstanding amount of the Funding Capital exceeds the Funding Base (a "Funding Base Deficiency"), PurchaseCo |

[DOCPROPERTY DOCXDOCID DMS=NetDocuments Format=<<ID>>v.<<VER>> <<Client>>-<<Matter>> PRESERVELOCATION]

OHPLPG00073117

Nonbinding Term Sheet

shall immediately pay OHP in an amount sufficient to eliminate the Funding Base Deficiency.

–"Eligible Receivables" shall mean any payment stream from a File (or collectively, a Package for a given month) that satisfies either of the following conditions: (a) receives unanimous consent for purchase by all the PurchaseCo Parties, or (b) meets the following criteria: (1) such receivable has had at least its first payment made, and (2) such receivable has a purchase cost of less than the lesser of (i) 40% of the total expected cash flows to be collected over the term of the File or Package (prior to management fee or cancellations), or (ii) 7.5% of the total gross balance of debt enrolled per File or Package.

**CONDITIONS PRECEDENT:**

The creation of PurchaseCo will be subject to satisfaction of the conditions precedent deemed appropriate by OHP for the an alignment of interest between the PurchaseCo Parties, defined as the following:

Coast shall certify that ~~its principals~~Brian Reale, Asante Bayrooti and Mario Azevedo (the "Principals") individually and their other Package-buying entities, including but not limited to ABR Enterprises, LLC, Freedom Enrollment, and any trusts or entities owned, managed by, or for the benefit of ~~Coast's principals~~the Principals or their affiliates (the "Coast Entities"), shall not engage in the purchase of any new Packages that meet the criteria of an Eligible Receivable, unless OHP first declines to provide Funding Capital for the specific Package.

The execution of the Operating Agreement will also be subject to satisfaction of the conditions precedent deemed appropriate by OHP for transactions of this type generally and for this transaction in particular, including, but not limited to, the following:

- OHP shall have received from PurchaseCo all fees required to be paid and all expenses for which invoices have been presented.

- All governmental and third party approvals necessary in connection with the transaction(s) contemplated hereby and the continuing operations of PurchaseCo, Coast and its subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

- OHP shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, organizational documents, consents, and financing statements or similar filings, all in form and substance acceptable to OHP and its counsel.

The date on which the PurchaseCo Parties execute the Operating Agreement shall be referred to as the "Closing Date."

**PURCHASECO OPERATIONS:**

PurchaseCo will purchase, from lead generating and marketing companies affiliated with Coast ("Affiliates"), cash flow streams that represent the Affiliate's entire interest in customer payments for debt validation services ("Files"). All Files purchased within a calendar month will be collectively called a "Package." Files will be funded from the following capital sources of PurchaseCo, in order of availability:

1) Available cash on hand at PurchaseCo (retaining a minimum Cash (as hereinafter defined) balance of $25,000.00 at all times);

2                                   CONFIDENTIAL

OHPLPG00073118

Nonbinding Term Sheet

2) Funding Capital, up to the Commitment amount (one draw per month maximum); and

3) Equity infusion from the PurchaseCo Parties in proportion to the Ownership Interests.

Coast will manage the day-to-day operations of PurchaseCo and will administer all Package collections and management of the Files, with the help of a fund administrator (to be hired by PurchaseCo if so requested by OHP). Collections and management will operate substantially similar to the collections and management of current Packages of Files sold to third parties and as detailed in that certain B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020 (Exhibit A), including, but not limited to, the monthly maintenance fee and refund clawback mechanics. At any time, OHP may request that PurchaseCo and Coast engage a backup servicer to onboard in preparation for one day taking over PurchaseCo's servicing and collections should, in OHP's determination, Coast not be able to fulfill such duties. The Principals will be the primary negotiators with each Affiliate for the terms of Package or File purchases on behalf of PurchaseCo, and Coast, as well as the Coast Entities, will at all times with a fiduciary duty first and foremost to PurchaseCo. Any commission income due or received by any of Coast, Coast's principalsthe Principals, or its affiliates, related to the purchase of Files or Packages funded by PurchaseCo, shall be contributed to PurchaseCo and deemed income of Coast and not part of Coast's equity contributions to PurchaseCo. Should Coast or its affiliates ever create an Affiliate, Package- or File-buying entity or any other similar entity or joint venture (such business to be determined to be a similar business in OHP's reasonable discretion) that is owned or managed, directly or indirectly, by Coast or the Principals or affiliates, Coast will notify the PurchaseCo Parties in advance and will provide all reasonable disclosures as requested by the PurchaseCo Parties on a continuing and ongoing basis, including evidence that such business does not violate the terms of the Operating Agreement or any other contract among the PurchaseCo Parties and their assigns.

Each of OHP and Coast will appoint a manager to represent its interests at PurchaseCo. Authorization from both Managers representing the PurchaseCo Parties shall be required for certain business operations including, but not limited to, bank outflows (dual authorization required for any disbursements), debt drawdowns, debt prepayments, equity distributions, any raises of debt or equity or issuance/purchase of securities, annual budgeting, tax matters, any acquisition or sale of assets (except in the normal course), initiation or responses to any litigation, and other major activities deemed as such by OHP in its reasonable discretion (collectively "Major Decisions"). The PurchaseCo Parties hereby agree that the exclusive capital provider to PurchaseCo shall be OHP and its assigns, Coast, and Coast's principals. the Principals.

**RIGHT OF FIRST REFUSAL:**

For so long as PurchaseCo has not been wound down, PurchaseCo will have a right of first offer for any and all Files related to a Coast customer or that of a Coast Affiliate. Should PurchaseCo decline to fund payments associated with a specific File, then the File may be offered to any other party without limitation.For so long as PurchaseCo has not been wound down, PurchaseCo will have a right of first offer for any and all Files or Packages related to a Coast customer, that of an Affiliate, an affiliate of Coast or a Principal of Coast. Should OHP decline to have PurchaseCo fund payments associated with a

CONFIDENTIAL

OHPLPG00073119

Nonbinding Term Sheet

complete Package, then the Package may be offered to any other party, provided such offer be made on the same economic and qualitative terms (in OHP's reasonable discretion) as those offered to PurchaseCo. At no time shall Coast, an affiliate of Coast or a Principal of Coast present a File or a Package to any third-party prior to presentation to PurchaseCo and OHP and the rejection of such File or Package (subject to the immediately following sentence) by OHP. To the extent PurchaseCo is presented certain Files, but not a complete Package, any rejection of such Files by OHP shall not permit that such Files may be offered to any other party, until such time as OHP rejects the entire Package. Following a rejection of a Package, if any terms change for the acquisition of such Package, OHP (on PurchaseCo's behalf) must be presented with the revised terms for such Package with the opportunity to acquire such Package. The right of first offer set forth in this section shall continue regardless of default under the terms of the Operating Agreement or other definitive documents or of the number of times OHP has rejected Packages presented to PurchaseCo. In the event that OHP accepts a transaction, but PurchaseCo or Coast is in default of any agreement involving OHP, then OHP may, in its discretion, have such File or Package accounted for separately from all previously acquired Files or Packages or have such Files or Packages acquired by a different entity than PurchaseCo that may be owned and controlled by OHP.

**DISTRIBUTIONS:** At such time as a distribution is made by PurchaseCo to the PurchaseCo Parties, the "waterfall" would work as follows:

1. First, to OHP until such time as OHP has received a return of all Funding Capital contributed to PurchaseCo;
2. Next, to OHP until such time as OHP has received a return of its Equity Investment in PurchaseCo;
3. Next, to Coast until Coast has received a return of all of its Equity Investment in PurchaseCo; and
4. Thereafter, to the PurchaseCo Parties pro rata according to Ownership Interests.

~~SECURITY:~~

**CONDITIONS PRECEDENT TO EACH ADVANCE OF FUNDING CAPITAL:** In advance of each monthly funding request, Coast agrees to furnish to OHP, with ~~adequate~~at least two weeks' notice, a report, in a form to be agreed upon by the PurchaseCo Parties, which includes but is not limited to historical and projected performance statistics of Files purchased, organized by Affiliate. Funding of each monthly Funding Capital advance request is subject to OHP's receipt of and approval of such report, such approval not to be unreasonably withheld. Any nonresponse within forty-eight (48) hours of such receipt is deemed to be an approval of such report.

The making of each monthly contribution of Funding Capital shall further be conditioned upon (a) the accuracy of certain material representations and warranties which the PurchaseCo Parties shall set forth in the Operating Agreement following a further meet and confer on the subject; (b) there being no breach of any covenants in the Operating Agreement nor any Events of Default (as further defined below) in existence at the time of, or after giving effect to, the making of such contributions of Funding Capital; (c) there being no material adverse change in PurchaseCo's or Coast's business practices in existence at the time of, or after giving effect to the making of, such Funding Capital advance, except that Coast has sole discretion to control the manner in which its validation program is operated (the PurchaseCo Parties shall define

> Formatted: Not Highlight

CONFIDENTIAL

OHPLPG00073120

Nonbinding Term Sheet

"the scope of a material adverse change in business practices" in further detail as part of the Operating Agreement); and (d) after giving effect to the contribution of Funding Capital, the total outstanding balance of the Funding Capital to PurchaseCo shall not exceed the lesser of the Commitment or the Funding Base then in effect.

**FUNDING CAPITAL COVENANTS:**

The financial covenants under the Operating Agreement governing the Funding Capital shall be as follows:

- PurchaseCo shall not permit the Cancellation Rate (as hereinafter defined) of any monthly Package, or across all owned Files, to be greater than 40%, tested at the end of each calendar month; and

- PurchaseCo's Cash balance shall at all times be at least $25,000.00.

"Cancellation Rate" means, as of any date of determination thereof, an amount, expressed as a percentage, equal to (a) the total dollar amount of undiscounted expected future cash flows from Files cancelled, written off, or greater than 60 days overdue, divided by (b) the total dollar amount of undiscounted received and expected future cash flows from all Files.

"Cash" shall mean cash or cash equivalents of a person, (a) that are not, and are not required to be, designated as "restricted" on the financial statements of such person, (b) that are not contractually required, and have not been contractually committed by such person, to be used for a specific purpose, (c) that are not subject to (i) any provision of law, statute, rule or regulation, (ii) any provision of the organizational documents of such person, or (iii) any order of any governmental authority, (d) in which no person has a lien, and (e) that are held in a deposit account or securities account, as applicable, in which OHP has direct access.

A violation of either of these terms covenants shall entitle OHP to, in its sole discretion: (a) withhold future investment notwithstanding any representation to the contrary, and ( without waiving its ROFO/ROFR, (b) accelerate the repayment of Funding Capital to OHP pursuant to the Distributions section above., and (c) gain sole authority over any bank account of PurchaseCo.

**REPRESENTATIONS AND WARRANTIES:**

The Operating Agreement shall contain representations and warranties customary for transactions of this type and other terms deemed appropriate by OHP, including with respect to licenses, permits and compliance with law.

**AFFIRMATIVE COVENANTS:**

The affirmative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, the following: delivery to PurchaseCo Parties of monthly, quarterly and annual financial statements of Coast and PurchaseCo; annual audits with unqualified opinions of PurchaseCo and Coast; access to real-time performance of packages; delivery of quarterly monthly projections by Coast for OHP's expected advances of Funding Capital; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations and obtainment and maintenance of any and all applicable licenses with proper authorities, if any, by both Coast and PurchaseCo; accuracy of information; maintenance of property and general liability insurance; maintenance of books and records; right of OHP to inspect property and books and records of Coast and PurchaseCo; notices of defaults and notice of formal service of lawsuits against PurchaseCo and Coast; continued unrestricted access provided to OHP of all PurchaseCo's bank accounts; use of proceeds of Funding Capital; and all or substantially all of professional time of Coast's

5                                          CONFIDENTIAL

OHPLPG00073121

Nonbinding Term Sheet

senior management devoted to the management of the business of Coast and PurchaseCo.

**NEGATIVE COVENANTS:**

The negative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, limitations on the following (subject to exceptions, as appropriate, to be negotiated and including the specific exceptions set forth herein):

- indebtedness (including guarantee obligations);
- liens;
- fundamental changes (including mergers, consolidations, liquidations, dissolutions, and divisions; changes in fiscal year and changes in line of business; transfers of interests; issuances of securities);
- investments;
- dispositions of assets outside the normal course;
- payment of restricted payments (including dividends and other payments in respect of equity interests);
- ~~; or~~
- negative pledge clauses on the PurchaseCo Parties; or
- amendment of material documents.

**EVENTS OF DEFAULT:**

Following an Event of Default (as hereinafter defined), the Commitment shall, at the sole discretion of OHP, be reduced to $0.00, and OHP shall take sole control over PurchaseCo, any managers of PurchaseCo appointed by Coast will be removed as a manager, and OHP shall cause all assets of PurchaseCo, including existing cash and any cash from receivables owned by PurchaseCo, to be distributed directly to OHP until OHP's Funding Capital and Equity Investment are fully repaid. Following full repayment of OHP's Funding Capital and Equity Investment, PurchaseCo's operations and ownership shall revert as if such Event of Default had not occurred. An "Event of Default" includes, without limitation: nonpayment of fees or other amounts when due under any purchase agreement or the Operating Agreement; representations and warranties set forth in the Operating Agreement becoming incorrect in any material respect (the PurchaseCo Parties shall define the scope of relevant representations and warranties and materiality thresholds related thereto in further detail as part of the Operating Agreement), subject to reasonable cure periods; violation of covenants (subject, in the case of certain affirmative covenants, to a ~~grace~~commercially reasonable cure period to be agreed upon); occurrence of a default (whether or not resulting in acceleration) under any agreement governing indebtedness, in excess of an amount to be agreed upon, of PurchaseCo; bankruptcy events of PurchaseCo, Coast or ~~Coast's principals~~the Principals; conviction or guilty or nolo contendere pleas of a criminal offense or civil judgment in excess of $50,000.00 of PurchaseCo, Coast or any of ~~Coast's principals~~the Principals; and certain ERISA events.

**EXPENSES AND INDEMNIFICATION:**

PurchaseCo shall pay (a) all expenses of OHP associated with the preparation, execution, delivery and administration of the Operating Agreement, prior Package and File purchase agreements, and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) whether or not the transaction closes, (b) all expenses of OHP (including the fees, disbursements and other charges of counsel) in connection

6          CONFIDENTIAL

OHPLPG00073122

Nonbinding Term Sheet

|  | with the enforcement of the Operating Agreement and all ongoing business expenses of OHP (including but not limited to administration, tax, legal and accounting), (c) fees and expenses associated with other advisors and professionals engaged by OHP in connection with the PurchaseCo Operating Agreement, and (d) other related expenses incurred by OHP during the due diligence process. |
|---|---|
|  | The Operating Agreement will contain standard indemnification and exculpation language related to the members of PurchaseCo. |
| **GOVERNING LAW:** | This term sheet is, and the Operating Agreement will be, governed by the internal laws of the State of Delaware. |
| **WAIVER OF JURY TRIAL:** | In the Operating Agreement, each party will agree to a waiver of jury trial substantially similar in form and substance to the following: |
|  | EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. |
| **VENUE:** | Orange County, California. |

CONFIDENTIAL

OHPLPG00073123

Nonbinding Term Sheet

      Each of the parties hereby approves and adopts this Term Sheet as of _____, 2020.

**B.A.T. Inc.**

By: _____
Name: _____
Title: _____

**Coast Processing Principals, individually**

By: _____
Name:  Brian Reale

By: _____
Name:  Asante Bayrooti

By: _____
Name:  Mario Azevedo

**Old Hickory Partners – Coast, LP**

By:     Old Hickory GP, LLC,
        its general partner

By: _____
Name:  Adam C. Blum
Title:  Manager

8                                   CONFIDENTIAL

OHPLPG00073124

Nonbinding Term Sheet

<u>Exhibit A:</u>
<u>B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020</u>

CONFIDENTIAL

OHPLPG00073125

Appointment

| | |
|---|---|
| **From**: | kevin.yu93@gmail.com [kevin.yu93@gmail.com] |
| **Sent**: | 1/7/2021 10:30:22 PM |
| **To**: | kevin.yu93@gmail.com |

| | |
|---|---|
| **Subject**: | Accepted: Coast-OHP Term Sheet @ Fri Jan 8, 2021 3:30pm - 4:30pm (CST) (kevin.yu93@gmail.com) |
| **Attachments**: | invite.ics |
| **Location**: | (US)  +1 304-774-5159 PIN:  453 771 997# |

| | |
|---|---|
| **Start**: | 1/8/2021 9:30:00 PM |
| **End**: | 1/8/2021 10:30:00 PM |
| **Show Time As**: | Busy |

| | |
|---|---|
| **Recurrence**: | (none) |

---

tony@coastprocessing.com has accepted this invitation.
**Coast-OHP Term Sheet**

| | |
|---|---|
| *When* | Fri Jan 8, 2021 3:30pm – 4:30pm Central Time · Chicago |
| *Where* | (US) +1 304-774-5159 PIN: 453 771 997# **(Error! Hyperlink reference not valid.)** |
| *Calendar* | kevin.yu93@gmail.com |
| *Who* | · kevin.yu93@gmail.com - organizer |
| | · arosell@winstead.com |
| | · tony@coastprocessing.com |
| | · ballen@winstead.com |
| | · adamblum@aol.com - optional |

Ok, thanks! Can we pencil in 1:30 pm Pacific tomorrow?

Thanks!

On Thu, Jan 7, 2021 at 1:48 PM Kevin Yu wrote:
>
> Hi Tony,
>
> We caught up with our counsel, are you free at or after 1 PM PST tomorrow (Friday) to talk with them?
>
> We are generally okay with most of your changes, but given the carte blanche to operate outside of PurchaseCo, we felt the need to shore up the ROFR. I think it's probably more efficient to keep it small between the lawyers and focus on making sure the legal language is accomplishing our intentions. From an economic perspective, we don't believe we've altered anything and given all of our previous discussions we were cognizant to ensure that:
>
> 1) Everything has a cure period to prevent any "gotchas"
...

---

Invitation from **Error! Hyperlink reference not valid.**

You are receiving this email at the account kevin.yu93@gmail.com because you are subscribed for invitation

EXHIBIT 511

OHPLPG00073126

replies on calendar kevin.yu93@gmail.com.

To stop receiving these emails, please log in to https://calendar.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. **Error! Hyperlink reference not valid.**.



invite.ics

OHPLPG00073127

| | |
|---|---|
| **Organizer:** | kevin.yu93@gmail.com **:** kevin.yu93@gmail.com |
| **Subject:** | Coast-OHP Term Sheet |
| **Location:** | (US) +1 304-774-5159 PIN: 453 771 997# |
| **Start Time:** | 2021-01-08T21:30:00Z |
| **End Time:** | 2021-01-08T22:30:00Z |
| **Attendees:** | tony@coastprocessing.com **:** tony@coastprocessing.com |

Ok, thanks!  Can we pencil in 1:30 pm Pacific tomorrow?

Thanks!

On Thu, Jan 7, 2021 at 1:48 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
>
> Hi Tony,
>
> We caught up with our counsel, are you free at or after 1 PM PST tomorrow (Friday) to talk with them?
>
> We are generally okay with most of your changes, but given the carte blanche to operate outside of PurchaseCo, we felt the need to shore up the ROFR. I think it's probably more efficient to keep it small between the lawyers and focus on making sure the legal language is accomplishing our intentions. From an economic perspective, we don't believe we've altered anything and given all of our previous discussions we were cognizant to ensure that:
>
> 1) Everything has a cure period to prevent any "gotchas"
...

OHPLPG00073128

Message

**From**: Tony Diab [tony@coastprocessing.com]
on behalf of    Tony Diab <tony@coastprocessing.com> [tony@coastprocessing.com]
**Sent**: 1/7/2021 9:49:19 PM
**To**: Kevin Yu [kevin.yu93@gmail.com]
**Subject**: Re: Coast-OHP Term Sheet

Ok, thanks!  Can we pencil in 1:30 pm Pacific tomorrow?

Thanks!

On Thu, Jan 7, 2021 at 1:48 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi Tony,

We caught up with our counsel, are you free at or after 1 PM PST tomorrow (Friday) to talk with them?

We are generally okay with most of your changes, but given the carte blanche to operate outside of PurchaseCo, we felt the need to shore up the ROFR. I think it's probably more efficient to keep it small between the lawyers and focus on making sure the legal language is accomplishing our intentions. From an economic perspective, we don't believe we've altered anything and given all of our previous discussions we were cognizant to ensure that:

1) Everything has a cure period to prevent any "gotchas"
2) There is no scenario where OHP is entitled to anything beyond the return of our Funding Capital and 30% of remaining equity

Finishing up a few last edits and will circulate the revisions shortly.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


On Thu, Dec 24, 2020 at 9:32 PM Tony Diab <tony@coastprocessing.com> wrote:
Revision per our conversation.  Please let me know as soon as you speak with your team on the issue we identified, and then we can set up a call with the group.  Asante and Brian would like to reach a resolution point as soon as possible.

Thanks!

On Thu, Dec 17, 2020 at 12:11 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Sure. See attached.


Kevin Yu
kevin.yu93@gmail.com

EXHIBIT 512

OHPLPG00073129

(512) 888-8897

On Thu, Dec 17, 2020 at 1:43 PM Tony Diab <tony@coastprocessing.com> wrote:
Hi Kevin -

Can you send as a word document, a few proposed revisions.

Thanks!

On Wed, Dec 16, 2020 at 1:54 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or concerns.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897
--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com



--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com



--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013

OHPLPG00073130

tony@coastprocessing.com

OHPLPG00073131

Message

| | |
|---|---|
| **From**: | Kevin Yu [kevin.yu93@gmail.com] |
| **on behalf of** | Kevin Yu <kevin.yu93@gmail.com> [kevin.yu93@gmail.com] |
| **Sent**: | 1/7/2021 9:48:07 PM |
| **To**: | Tony Diab [tony@coastprocessing.com] |
| **BCC**: | Adam Blum [AdamBlum@aol.com] |
| **Subject**: | Re: Coast-OHP Term Sheet |

Hi Tony,

We caught up with our counsel, are you free at or after 1 PM PST tomorrow (Friday) to talk with them?

We are generally okay with most of your changes, but given the carte blanche to operate outside of PurchaseCo, we felt the need to shore up the ROFR. I think it's probably more efficient to keep it small between the lawyers and focus on making sure the legal language is accomplishing our intentions. From an economic perspective, we don't believe we've altered anything and given all of our previous discussions we were cognizant to ensure that:

1) Everything has a cure period to prevent any "gotchas"
2) There is no scenario where OHP is entitled to anything beyond the return of our Funding Capital and 30% of remaining equity

Finishing up a few last edits and will circulate the revisions shortly.

Thanks,



Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


On Thu, Dec 24, 2020 at 9:32 PM Tony Diab <tony@coastprocessing.com> wrote:
> Revision per our conversation.  Please let me know as soon as you speak with your team on the issue we
> identified, and then we can set up a call with the group.  Asante and Brian would like to reach a resolution
> point as soon as possible.
>
> Thanks!
>
> On Thu, Dec 17, 2020 at 12:11 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
>> Sure. See attached.
>>
>>
>> Kevin Yu
>> kevin.yu93@gmail.com
>> (512) 888-8897
>>
>>
>> On Thu, Dec 17, 2020 at 1:43 PM Tony Diab <tony@coastprocessing.com> wrote:
>>> Hi Kevin -

EXHIBIT 513

OHPLPG00073132

Can you send as a word document, a few proposed revisions.

Thanks!

On Wed, Dec 16, 2020 at 1:54 PM Kevin Yu <kevin.yu93@gmail.com> wrote:

Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or concerns.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897
--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com



--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

OHPLPG00073133

Message

| | |
|---|---|
| **From**: | Tony Diab [tony@coastprocessing.com] |
| on behalf of | Tony Diab <tony@coastprocessing.com> [tony@coastprocessing.com] |
| **Sent**: | 12/25/2020 3:32:13 AM |
| **To**: | Kevin Yu [kevin.yu93@gmail.com] |
| **Subject**: | Re: Coast-OHP Term Sheet |
| **Attachments**: | Old Hickory - Coast Processing -Term sheet - December 16, 2020.docx |

Revision per our conversation.  Please let me know as soon as you speak with your team on the issue we identified, and then we can set up a call with the group.  Asante and Brian would like to reach a resolution point as soon as possible.

Thanks!

On Thu, Dec 17, 2020 at 12:11 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Sure. See attached.


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


On Thu, Dec 17, 2020 at 1:43 PM Tony Diab <tony@coastprocessing.com> wrote:
Hi Kevin -

Can you send as a word document, a few proposed revisions.

Thanks!

On Wed, Dec 16, 2020 at 1:54 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or concerns.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897
--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013


EXHIBIT 514

tony@coastprocessing.com

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

OHPLPG00073135

Nonbinding Term Sheet

COAST PROCESSING
INDICATIVE SUMMARY OF TERMS AND CONDITIONS

This Indicative Summary of Terms and Conditions is intended only as an outline of certain of the material terms of the proposed operating agreement (the "Operating Agreement") for PurchaseCo, a Delaware limited liability company to be jointly owned and managed by Old Hickory Partners – Coast, L.P. ("OHP") and B.A.T. Inc. dba Coast Processing and its principals Brian Reale, Asante Bayrooti and Mario Azevedo ("Coast," and together with OHP, the "PurchaseCo Parties") and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive documentation for the structure of the Operating Agreement contemplated hereby.

| | |
|---|---|
| **PURCHASECO ENTITY:** | The PurchaseCo Parties will establish PurchaseCo, a Delaware limited liability company to be jointly owned and managed by OHP and Coast for the exclusive purpose of purchasing all future cash flow streams from individual receivables (collectively, "Packages") sourced by Coast and its Affiliates, and to receive cash flows therefrom. |
| **OWNERSHIP:** | Each PurchaseCo Party's respective interest in PurchaseCo ("Ownership Interest") is as follows:<br><br>Coast – 70%<br>OHP – 30% |
| **CAPITALIZATION:** | Prior to commencing operations at PurchaseCo, the PurchaseCo Parties will capitalize PurchaseCo with $300,000.00 of equity, pro rata, according to the Ownership Interests (the "Equity Investment"):<br><br>Coast – $210,000.00<br>OHP – $90,000.00<br><br>One time per month, PurchaseCo can issue an additional capital call request to OHP for the sole purpose of funding the purchase of Eligible Receivables (as hereinafter defined) that PurchaseCo's cash on hand cannot fund (the "Funding Capital"). The PurchaseCo Parties agree that OHP's Ownership Interest in PurchaseCo will not exceed 30%, except in certain circumstances to be described in the Operating Agreement, and is not adjusted by its contributions of Funding Capital.<br><br>OHP's Funding Capital is available over 5 years in the amount of $10 million (the "Commitment"); provided that during the first 6 months starting from the Closing Date (as hereinafter defined), availability of Funding Capital shall be limited to $5 million, and that the first advance of Funding Capital shall be limited to $2 million.  Any distributions of Funding Capital to OHP are subject to reinvestment by PurchaseCo to fund additional Eligible Receivables. The Commitment term and size can be increased at OHP's option.<br><br>PurchaseCo's ability to call Funding Capital shall be subject to certain restrictions set forth in the Operating Agreement, including the Cost Basis of Eligible Receivables measured as of the last day of the prior month (the "Funding Base"). The Funding Base as of any date of determination shall be an amount equal to 100% of the Cost Basis of Eligible Receivables.  The "Cost Basis" of Eligible Receivables refers to the amount paid to Affiliates for a File (as hereinafter defined) or Packages.  For the purposes of calculating the Funding Base, Eligible Receivables shall also include any Files or Packages contracted with Affiliates and approved for purchase by PurchaseCo in the current month.  To the extent that the outstanding amount of the Funding Capital exceeds the Funding Base (a "Funding Base Deficiency"), PurchaseCo |

1                    CONFIDENTIAL

[DOCPROPERTY DOCXDOCID DMS=NetDocuments Format=<<ID>>v.<<VER>> <<Client>>-<<Matter>> PRESERVELOCATION]

Nonbinding Term Sheet

shall immediately pay OHP in an amount sufficient to eliminate the Funding Base Deficiency.

~~"Eligible Receivables" shall mean a payment stream from a File (or collectively, a Package for a given month) that satisfies each of the following conditions, unless expressly waived in advance by OHP, for any specific purchase: (a) such receivable has had at least its first payment made, and (b) such receivable has a purchase cost of less than the lesser of (1) 40% of the total expected cash flows to be collected over the term of the File or Package (prior to management fee or cancellations), or (2) 7.5% of the total gross balance of debt enrolled per File or Package.~~

**CONDITIONS PRECEDENT:**

The creation of PurchaseCo will be subject to satisfaction of the conditions precedent deemed appropriate by OHP for the an alignment of interest between the PurchaseCo Parties, ~~including, but not limited to,~~ defined as the following:

Coast shall certify that its principals individually and their other Package-buying entities, including but not limited to ABR Enterprises, LLC, Freedom Enrollment, and any trusts or entities owned, managed by, or for the benefit of Coast's principals or their affiliates (the "Coast Entities"), shall not engage in the purchase of any new Packages that meet the criteria of an Eligible Receivable, unless OHP first declines to provide Funding Capital for the specific Package. ~~The Coast Entities in aggregate shall not, in any event, purchase more than $300,000.00 in new Packages in any consecutive 3 month period, measured on the last day of a given month.~~

The execution of the Operating Agreement will also be subject to satisfaction of the conditions precedent deemed appropriate by OHP for transactions of this type generally and for this transaction in particular, including, but not limited to, the following:

- OHP shall have received from PurchaseCo all fees required to be paid and all expenses for which invoices have been presented.
- All governmental and third party approvals necessary in connection with the transaction(s) contemplated hereby and the continuing operations of PurchaseCo, Coast and its subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.
- OHP shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, organizational documents, consents, and financing statements or similar filings, all in form and substance acceptable to OHP and its counsel.
- ~~The organizational, capital structure, debt instruments, material accounts and governing documents of Coast and PurchaseCo and their affiliates shall be acceptable to OHP.~~

The date on which the PurchaseCo Parties execute the Operating Agreement shall be referred to as the "Closing Date."

**PURCHASECO OPERATIONS:**

PurchaseCo will purchase ~~at cost (no mark-up)~~, from lead generating and marketing companies affiliated with Coast ("Affiliates"), cash flow streams that represent the Affiliate's entire interest in customer payments for debt validation services ("Files"). All Files purchased within a calendar month will

2                              CONFIDENTIAL

OHPLPG00073137

Nonbinding Term Sheet

be collectively called a "Package." Files will be funded from the following capital sources of PurchaseCo, in order of availability:

1) Available cash on hand at PurchaseCo (retaining a minimum Cash (as hereinafter defined) balance of $25,000.00 at all times);

2) Funding Capital, up to the Commitment amount (one draw per month maximum); and

3) Equity infusion from the PurchaseCo Parties in proportion to the Ownership Interests.

Coast will manage the day-to-day operations of PurchaseCo and will administer all Package collections and management of the Files, with the help of a fund administrator (to be hired by PurchaseCo if so requested by OHP). Collections and management will operate substantially similar to the collections and management of current Packages of Files sold to third parties and as detailed in that certain B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020 (Exhibit A), including, but not limited to, the monthly maintenance fee and refund clawback mechanics. At any time, OHP may request that PurchaseCo and Coast engage a backup servicer to onboard in preparation for one day taking over PurchaseCo's servicing and collections should, in OHP's determination, Coast not be able to fulfill such duties. Any commission income due or received by any of Coast, Coast's principals, or its affiliates, related to the purchase of Files or Packages funded by PurchaseCo, shall be contributed to PurchaseCo and deemed income of PurchaseCo and not part of Coast's equity contributions to PurchaseCo. ~~Should Coast or its affiliates ever create an Affiliate or any other similar entity or joint venture (such business to be determined to be an Affiliate or similar business in OHP's reasonable discretion) that is owned or managed, directly or indirectly, by Coast or its principals or affiliates, PurchaseCo shall own a no-cost ownership interest in such Affiliate amounting to 30% and shall have no capital contribution requirements thereto nor any share of liabilities therefrom.~~

Each of OHP and Coast will appoint a manager to represent its interests at PurchaseCo. Authorization from both Managers representing the PurchaseCo Parties shall be required for certain business operations including, but not limited to, bank outflows (dual authorization required for any disbursements), debt drawdowns, debt prepayments, equity distributions, any raises of debt or equity or issuance/purchase of securities, annual budgeting, tax matters, any acquisition or sale of assets (except in the normal course), initiation or responses to any litigation, and other major activities deemed as such by OHP in its reasonable discretion (collectively "Major Decisions"). The PurchaseCo Parties hereby agree that the exclusive capital provider to PurchaseCo shall be OHP and its assigns, Coast, and Coast's principals.

**RIGHT OF FIRST REFUSAL:**   For so long as PurchaseCo has not been wound down, PurchaseCo will have a right of first offer for any and all Files related to a Coast customer or that of a Coast Affiliate. Should PurchaseCo decline to fund payments associated with a specific File, then the File may be offered to ~~unaffiliated third-party investors. At no point in time can Coast, its subsidiaries, or its affiliates, other than PurchaseCo, be offered a File or cash flows therefrom, except as noted in the Conditions Precedent section above~~any other party without limitation.

**DISTRIBUTIONS:**   At such time as a distribution is made by PurchaseCo to the PurchaseCo Parties, the "waterfall" would work as follows:

3

CONFIDENTIAL

OHPLPG00073138

Nonbinding Term Sheet

1. First, to OHP until such time as OHP has received a return of all Funding Capital contributed to PurchaseCo;
2. Next, to OHP until such time as OHP has received a return of its Equity Investment in PurchaseCo;
3. Next, to Coast until Coast has received a return of all of its Equity Investment in PurchaseCo; and
4. Thereafter, to the PurchaseCo Parties pro rata according to Ownership Interests.

**SECURITY:** ~~PurchaseCo will be granted a second priority lien on the office building to be purchased by Coast and any other physical property thereafter purchased by Coast. If at any time a first lien on such property is repaid in full and terminated, PurchaseCo shall have a first priority lien.~~

**CONDITIONS PRECEDENT TO EACH ADVANCE OF FUNDING CAPITAL:** In advance of each funding request, Coast agrees to furnish to OHP, with adequate notice, a report, in a form to be agreed upon by the PurchaseCo Parties, which includes but is not limited to historical and projected performance statistics of Files purchased, organized by Affiliate. Funding of each Funding Capital advance request is subject to OHP's receipt of and approval of such report, such approval not to be unreasonably withheld. Any nonresponse within ~~a specified period~~forty-eight (48) hours of such receipt ~~of time by OHP~~ is deemed to be an approval of such report.

The making of each monthly contribution of Funding Capital shall further be conditioned upon (a) the accuracy of certain material representations and warranties which the Parties shall set forth in the Operating Agreement following a further meet and confer on the subject;~~the accuracy of all representations and warranties in the Operating Agreement (including, without limitation, the material adverse change and litigation representations);~~ (b) there being no breach of any covenants in the Operating Agreement nor any Events of Default (as further defined below) in existence at the time of, or after giving effect to the making of, such contributions of Funding Capital; (c) there being no material adverse change in PurchaseCo's or Coast's business practices in existence at the time of, or after giving effect to the making of, such Funding Capital advance, except that Coast has sole discretion to control the manner in which its validation program is operated (the Parties shall define "business practices" in further detail as part of the Operating Agreement); and (d) after giving effect to the contribution of Funding Capital, the total outstanding balance of the Funding Capital to PurchaseCo shall not exceed the lesser of the Commitment or the Funding Base then in effect.

**FUNDING CAPITAL COVENANTS:** The financial covenants under the Operating Agreement governing the Funding Capital shall be as follows:

- PurchaseCo shall not permit the Cancellation Rate (as hereinafter defined) of any monthly Package, or across all owned Files, to be greater than ~~25~~40%, tested at the end of each calendar month; and

- PurchaseCo's Cash balance shall at all times be at least $25,000.00.

"Cancellation Rate" means, as of any date of determination thereof, an amount, expressed as a percentage, equal to (a) the total dollar amount of undiscounted expected future cash flows from Files cancelled, written off, or greater than 60 days overdue, divided by (b) the total dollar amount of undiscounted received and expected future cash flows from all Files.

CONFIDENTIAL

Formatted: Not Highlight

Formatted: Highlight

OHPLPG00073139

Nonbinding Term Sheet

"<u>Cash</u>" shall mean cash or cash equivalents of a person, (a) that are not, and are not required to be, designated as "restricted" on the financial statements of such person, (b) that are not contractually required, and have not been contractually committed by such person, to be used for a specific purpose, (c) that are not subject to (i) any provision of law, statute, rule or regulation, (ii) any provision of the organizational documents of such person, or (iii) any order of any governmental authority, (d) in which no person has a lien, and (e) that are held in a deposit account or securities account, as applicable, in which OHP has direct access.

A violation of either of these terms shall entitle OHP to: (a) withhold future investment notwithstanding any representation to the contrary, and (b) accelerate the repayment of Funding Capital pursuant to the Distributions section above.

**REPRESENTATIONS AND WARRANTIES:**

The Operating Agreement shall contain representations and warranties customary for transactions of this type and other terms deemed appropriate by OHP, including with respect to licenses, permits and compliance with law.

**AFFIRMATIVE COVENANTS:**

The affirmative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, the following:  delivery of monthly, quarterly and annual financial statements of Coast and PurchaseCo; annual audits with unqualified opinions of PurchaseCo and Coast; ~~monthly compliance certificates and projections and monthly Funding Base certificates and other information requested by OHP, including materials prepared for and circulated to PurchaseCo's and Coast's boards of directors;~~ delivery of quarterly projections by Coast for OHP's expected advances of Funding Capital; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations and maintenance of any and all applicable licenses with proper ~~authorities~~ by both Coast and PurchaseCo; accuracy of information; maintenance of property and general liability insurance; maintenance of books and records; right of OHP to inspect property and books and records of Coast and PurchaseCo; notices of defaults, and notice of formal service of lawsuits litigation against PurchaseCo and Coast and other material events; continued unrestricted access provided to OHP of all PurchaseCo's bank accounts; use of proceeds of Funding Capital; and all or substantially all of professional time of Coast's senior management devoted to the management of the business of Coast and PurchaseCo.

**NEGATIVE COVENANTS:**

The negative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, limitations on the following (subject to exceptions, as appropriate, to be negotiated and including the specific exceptions set forth herein):

- indebtedness (including guarantee obligations);
- liens;
- fundamental changes (including mergers, consolidations, liquidations, dissolutions, and divisions; changes in fiscal year and changes in line of business; transfers of interests; issuances of securities);
- investments;
- dispositions of assets outside the normal course;
- payment of restricted payments (including dividends and other payments in respect of equity interests);

5

CONFIDENTIAL

Nonbinding Term Sheet

- ~~negative pledge clauses on the PurchaseCo Parties;~~
- ~~Eligible Receivables will not be funded by any person or entity other than OHP or PurchaseCo using its own internal funds;~~
- ~~Coast, Coast's senior management and principals, and any of their respective affiliates will not participate in any business related to, premised on, or competitive with purchasing debt validation receivables outside of Coast's current business arrangement and its participation with PurchaseCo, nor will Coast or its principals engage in any business brokering, trading or selling debt validation receivables outside of PurchaseCo~~; or
- amendment of material documents.

**EVENTS OF DEFAULT:** Following an Event of Default (as hereinafter defined), the Commitment shall be reduced to $0, and OHP shall take sole control over PurchaseCo and cause all assets of PurchaseCo, including existing cash and any cash from receivables owned by PurchaseCo, to be distributed directly to OHP until OHP's Funding Capital and Equity Investment are fully repaid. Following full repayment of OHP's Funding Capital and Equity Investment, PurchaseCo's operations and ownership shall revert as if such Event of Default had not occurred. An "Event of Default" includes, without limitation: nonpayment of fees or other amounts when due under any purchase agreement or the Operating Agreement; ~~representations and warranties set forth in the Operating Agreement becoming incorrect in any material respect;~~ violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); occurrence of a default (whether or not resulting in acceleration) under any agreement governing indebtedness, in excess of an amount to be agreed upon, of PurchaseCo; bankruptcy events of PurchaseCo, Coast or Coast's principals; ~~guilty or nolo contendere pleas by PurchaseCo, Coast or any of Coast's principals to any offense;~~ conviction of a criminal offense or civil judgment in excess of $50,000 of PurchaseCo, Coast or any of Coast's principals; ~~and~~ certain ERISA events~~; material adverse changes that, in OHP's discretion, negatively impact PurchaseCo's or Coast's business prospects; a change of control at either PurchaseCo or Coast; and a meaningful (in OHP's discretion) increase in the volume of complaints filed against PurchaseCo, Coast, or Coast's Affiliates on files held by PurchaseCo, to the BBB, EEOC or other national consumer service.~~

**EXPENSES AND INDEMNIFICATION:** PurchaseCo shall pay (a) all expenses of OHP associated with the preparation, execution, delivery and administration of the Operating Agreement, prior Package and File purchase agreements, and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) whether or not the transaction closes, (b) all expenses of OHP (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Operating Agreement and all ongoing business expenses of OHP (including but not limited to administration, tax, legal and accounting), (c) fees and expenses associated with other advisors and professionals engaged by OHP in connection with the PurchaseCo Operating Agreement, and (d) other related expenses incurred by OHP during the due diligence process.

The Operating Agreement will contain standard indemnification and exculpation language related to the members of PurchaseCo.

6                          CONFIDENTIAL

OHPLPG00073141

Nonbinding Term Sheet

| | |
|---|---|
| **GOVERNING LAW:** | This term sheet is, and the Operating Agreement will be, governed by the internal laws of the State of Delaware. |
| **WAIVER OF JURY TRIAL:** | In the Operating Agreement, each party will agree to a waiver of jury trial substantially similar in form and substance to the following: |
| | EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. |
| **VENUE:** | Travis County, TexasOrange County, California. |

7                                     CONFIDENTIAL

OHPLPG00073142

Nonbinding Term Sheet

Each of the parties hereby approves and adopts this Term Sheet as of _____, 2020.

**B.A.T. Inc.**

By: _____
Name: _____
Title: _____

**Coast Processing Principals, individually**

By: _____
Name:  Brian Reale

By: _____
Name:  Asante Bayrooti

By: _____
Name:  Mario Azevedo

**Old Hickory Partners – Coast, LP**

By:      Old Hickory GP, LLC,
         its general partner

By: _____
Name:  Adam C. Blum
Title:  Manager

8                              CONFIDENTIAL

Nonbinding Term Sheet

Exhibit A:
B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020

CONFIDENTIAL

OHPLPG00073144

Message

| | |
|---|---|
| **From**: | Tony Diab [tony@coastprocessing.com] |
| on behalf of | Tony Diab <tony@coastprocessing.com> [tony@coastprocessing.com] |
| **Sent**: | 12/23/2020 6:42:53 PM |
| **To**: | Kevin Yu [kevin.yu93@gmail.com] |
| **CC**: | Brian [brian@freedomea.com]; Asante Bayrooti [asante@coastprocessing.com]; Mario Azevedo [mario@azevedo.com]; Adam Blum [AdamBlum@aol.com] |
| **Subject**: | Re: Coast-OHP Term Sheet |
| **Attachments**: | Old Hickory - Coast Processing -Term sheet - December 16, 2020.docx |

Hi Kevin -

Attached is a revised version that Brian and Asante are comfortable with, please review.  While we are not at a position where this is a take or leave it offer, we hope that we have been clear in conveying our desire to create a relationship where you have the opportunity to invest, but otherwise Coast Processing retains the control and freedom it has enjoyed throughout its existence.  We hope the attached is acceptable.

Thanks!

On Wed, Dec 16, 2020 at 1:54 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or concerns.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

EXHIBIT 515

OHPLPG00073145

Nonbinding Term Sheet

COAST PROCESSING
INDICATIVE SUMMARY OF TERMS AND CONDITIONS

This Indicative Summary of Terms and Conditions is intended only as an outline of certain of the material terms of the proposed operating agreement (the "Operating Agreement") for PurchaseCo, a Delaware limited liability company to be jointly owned and managed by Old Hickory Partners – Coast, L.P. ("OHP") and B.A.T. Inc. dba Coast Processing and its principals Brian Reale, Asante Bayrooti and Mario Azevedo ("Coast," and together with OHP, the "PurchaseCo Parties") and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive documentation for the structure of the Operating Agreement contemplated hereby.

| | |
|---|---|
| **PURCHASECO ENTITY:** | The PurchaseCo Parties will establish PurchaseCo, a Delaware limited liability company to be jointly owned and managed by OHP and Coast for the exclusive purpose of purchasing all future cash flow streams from individual receivables (collectively, "Packages") sourced by Coast and its Affiliates, and to receive cash flows therefrom. |
| **OWNERSHIP:** | Each PurchaseCo Party's respective interest in PurchaseCo ("Ownership Interest") is as follows:<br><br>Coast – 70%<br>OHP – 30% |
| **CAPITALIZATION:** | Prior to commencing operations at PurchaseCo, the PurchaseCo Parties will capitalize PurchaseCo with $300,000.00 of equity, pro rata, according to the Ownership Interests (the "Equity Investment"):<br><br>Coast – $210,000.00<br>OHP – $90,000.00<br><br>One time per month, PurchaseCo can issue an additional capital call request to OHP for the sole purpose of funding the purchase of Eligible Receivables (as hereinafter defined) that PurchaseCo's cash on hand cannot fund (the "Funding Capital"). The PurchaseCo Parties agree that OHP's Ownership Interest in PurchaseCo will not exceed 30%, except in certain circumstances to be described in the Operating Agreement, and is not adjusted by its contributions of Funding Capital.<br><br>OHP's Funding Capital is available over 5 years in the amount of $10 million (the "Commitment"); provided that during the first 6 months starting from the Closing Date (as hereinafter defined), availability of Funding Capital shall be limited to $5 million, and that the first advance of Funding Capital shall be limited to $2 million. Any distributions of Funding Capital to OHP are subject to reinvestment by PurchaseCo to fund additional Eligible Receivables. The Commitment term and size can be increased at OHP's option.<br><br>PurchaseCo's ability to call Funding Capital shall be subject to certain restrictions set forth in the Operating Agreement, including the Cost Basis of Eligible Receivables measured as of the last day of the prior month (the "Funding Base"). The Funding Base as of any date of determination shall be an amount equal to 100% of the Cost Basis of Eligible Receivables. The "Cost Basis" of Eligible Receivables refers to the amount paid to Affiliates for a File (as hereinafter defined) or Packages. For the purposes of calculating the Funding Base, Eligible Receivables shall also include any Files or Packages contracted with Affiliates and approved for purchase by PurchaseCo in the current month. To the extent that the outstanding amount of the Funding Capital exceeds the Funding Base (a "Funding Base Deficiency"), PurchaseCo |

[DOCPROPERTY DOCXDOCID DMS=NetDocuments Format=<<ID>>v.<<VER>> <<Client>>-<<Matter>> PRESERVELOCATION]

OHPLPG00073146

Nonbinding Term Sheet

shall immediately pay OHP in an amount sufficient to eliminate the Funding Base Deficiency.

"Eligible Receivables" shall mean a~~ny payment stream from a File (or collectively, a Package for a given month) that satisfies either of the following conditions: (a) receives unanimous consent of all the PurchaseCo Parties, or (b) meets the following criteria:~~payment stream from a File (or collectively, a Package for a given month) that satisfies each of the following conditions, unless expressly waived in advance by OHP, for any specific purchase:   (a~~1~~) such receivable has had at least its first payment made, and (b~~2~~) such receivable has a purchase cost of less than the lesser of (~~1~~i) 40% of the total expected cash flows to be collected over the term of the File or Package (prior to management fee or cancellations), or (~~2~~ii) 7.5% of the total gross balance of debt enrolled per File or Package.

**CONDITIONS PRECEDENT:**

The creation of PurchaseCo will be subject to satisfaction of the conditions precedent deemed appropriate by OHP for the an alignment of interest between the PurchaseCo Parties, ~~including, but not limited to,~~defined as the following:

Coast shall certify that its principals individually and their other Package-buying entities, including but not limited to ABR Enterprises, LLC, Freedom Enrollment, and any trusts or entities owned, managed by, or for the benefit of Coast's principals or their affiliates (the "Coast Entities"), shall not engage in the purchase of any new Packages that meet the criteria of an Eligible Receivable, unless OHP first declines to provide Funding Capital for the specific Package. ~~The Coast Entities in aggregate shall not, in any event, purchase more than $300,000.00 in new Packages in any consecutive 3 month period, measured on the last day of a given month.~~

The execution of the Operating Agreement will also be subject to satisfaction of the conditions precedent deemed appropriate by OHP for transactions of this type generally and for this transaction in particular, including, but not limited to, the following:

- OHP shall have received from PurchaseCo all fees required to be paid and all expenses for which invoices have been presented.

- All governmental and third party approvals necessary in connection with the transaction(s) contemplated hereby and the continuing operations of PurchaseCo, Coast and its subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

- OHP shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, organizational documents, consents, and financing statements or similar filings, all in form and substance acceptable to OHP and its counsel.

- ~~The organizational, capital structure, debt instruments, material accounts and governing documents of Coast and PurchaseCo and their affiliates shall be acceptable to OHP.~~

The date on which the PurchaseCo Parties execute the Operating Agreement shall be referred to as the "Closing Date."

**PURCHASECO OPERATIONS:**

PurchaseCo will purchase ~~at cost (no mark-up)~~, from lead generating and marketing companies affiliated with Coast ("Affiliates"), cash flow streams that represent the Affiliate's entire interest in customer payments for debt

2                                    CONFIDENTIAL

OHPLPG00073147

Nonbinding Term Sheet

validation services ("Files"). All Files purchased within a calendar month will be collectively called a "Package." Files will be funded from the following capital sources of PurchaseCo, in order of availability:

1) Available cash on hand at PurchaseCo (retaining a minimum Cash (as hereinafter defined) balance of $25,000.00 at all times);

2) Funding Capital, up to the Commitment amount (one draw per month maximum); and

3) Equity infusion from the PurchaseCo Parties in proportion to the Ownership Interests.

Coast will manage the day-to-day operations of PurchaseCo and will administer all Package collections and management of the Files, with the help of a fund administrator (to be hired by PurchaseCo if so requested by OHP). Collections and management will operate substantially similar to the collections and management of current Packages of Files sold to third parties and as detailed in that certain B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020 (Exhibit A), including, but not limited to, the monthly maintenance fee and refund clawback mechanics. At any time, OHP may request that PurchaseCo and Coast engage a backup servicer to onboard in preparation for one day taking over PurchaseCo's servicing and collections should, in OHP's determination, Coast not be able to fulfill such duties. Any commission income due or received by any of Coast, Coast's principals, or its affiliates, related to the purchase of Files or Packages funded by PurchaseCo, shall be contributed to PurchaseCo and deemed income of PurchaseCo and not part of Coast's equity contributions to PurchaseCo. ~~Should Coast or its affiliates ever create an Affiliate or any other similar entity or joint venture (such business to be determined to be an Affiliate or similar business in OHP's reasonable discretion) that is owned or managed, directly or indirectly, by Coast or its principals or affiliates, PurchaseCo shall own a no-cost ownership interest in such Affiliate amounting to 30% and shall have no capital contribution requirements thereto nor any share of liabilities therefrom.~~

Each of OHP and Coast will appoint a manager to represent its interests at PurchaseCo. Authorization from both Managers representing the PurchaseCo Parties shall be required for certain business operations including, but not limited to, bank outflows (dual authorization required for any disbursements), debt drawdowns, debt prepayments, equity distributions, any raises of debt or equity or issuance/purchase of securities, annual budgeting, tax matters, any acquisition or sale of assets (except in the normal course), initiation or responses to any litigation, and other major activities deemed as such by OHP in its reasonable discretion (collectively "Major Decisions"). The PurchaseCo Parties hereby agree that the exclusive capital provider to PurchaseCo shall be OHP and its assigns, Coast, and Coast's principals.

**RIGHT OF FIRST REFUSAL:**

For so long as PurchaseCo has not been wound down, PurchaseCo will have a right of first offer for any and all Files related to a Coast customer or that of a Coast Affiliate. Should PurchaseCo decline to fund payments associated with a specific File, then the File may be offered to ~~unaffiliated third party investors. At no point in time can Coast, its subsidiaries, or its affiliates, other than PurchaseCo, be offered a File or cash flows therefrom, except as noted in the Conditions Precedent section above~~any other party without limitation.

3          CONFIDENTIAL

OHPLPG00073148

Nonbinding Term Sheet

**DISTRIBUTIONS:** At such time as a distribution is made by PurchaseCo to the PurchaseCo Parties, the "waterfall" would work as follows:

1. First, to OHP until such time as OHP has received a return of all Funding Capital contributed to PurchaseCo;
2. Next, to OHP until such time as OHP has received a return of its Equity Investment in PurchaseCo;
3. Next, to Coast until Coast has received a return of all of its Equity Investment in PurchaseCo; and
4. Thereafter, to the PurchaseCo Parties pro rata according to Ownership Interests.

**SECURITY:** ~~PurchaseCo will be granted a second priority lien on the office building to be purchased by Coast and any other physical property thereafter purchased by Coast. If at any time a first lien on such property is repaid in full and terminated, PurchaseCo shall have a first priority lien.~~

**CONDITIONS PRECEDENT TO EACH ADVANCE OF FUNDING CAPITAL:** In advance of each funding request, Coast agrees to furnish to OHP, with adequate notice, a report, in a form to be agreed upon by the PurchaseCo Parties, which includes but is not limited to historical and projected performance statistics of Files purchased, organized by Affiliate. Funding of each Funding Capital advance request is subject to OHP's receipt of and approval of such report, such approval not to be unreasonably withheld. Any nonresponse within ~~a specified period~~forty-eight (48) hours of such receipt ~~of time by OHP~~ is deemed to be an approval of such report.

The making of each monthly contribution of Funding Capital shall further be conditioned upon (a) ~~the accuracy of all representations and warranties in the Operating Agreement (including, without limitation, the material adverse change and litigation representations); (b)~~ there being no breach of any covenants in the Operating Agreement nor any Events of Default (as further defined below) in existence at the time of, or after giving effect to the making of, such contributions of Funding Capital; ~~(c) there being no material adverse change in PurchaseCo's or Coast's business in existence at the time of, or after giving effect to the making of, such Funding Capital advance;~~ and (<ins>d</ins>~~b~~) after giving effect to the contribution of Funding Capital, the total outstanding balance of the Funding Capital to PurchaseCo shall not exceed the lesser of the Commitment or the Funding Base then in effect.

**FUNDING CAPITAL COVENANTS:** The financial covenants under the Operating Agreement governing the Funding Capital shall be as follows:

- ~~PurchaseCo shall not permit the Cancellation Rate (as hereinafter defined) of any monthly Package, or across all owned Files, to be greater than 25%, tested at the end of each calendar month; and~~

- PurchaseCo's Cash balance shall at all times be at least $25,000.00.

~~"Cancellation Rate" means, as of any date of determination thereof, an amount, expressed as a percentage, equal to (a) the total dollar amount of undiscounted expected future cash flows from Files cancelled, written off, or greater than 60 days overdue, divided by (b) the total dollar amount of undiscounted received and expected future cash flows from all Files.~~

"<ins>Cash</ins>" shall mean cash or cash equivalents of a person, (a) that are not, and are not required to be, designated as "restricted" on the financial statements of such person, (b) that are not contractually required, and have not been contractually committed by such person, to be used for a specific purpose, (c) that are not

CONFIDENTIAL

OHPLPG00073149

Nonbinding Term Sheet

subject to (i) any provision of law, statute, rule or regulation, (ii) any provision of the organizational documents of such person, or (iii) any order of any governmental authority, (d) in which no person has a lien, and (e) that are held in a deposit account or securities account, as applicable, in which OHP has direct access.

**REPRESENTATIONS AND WARRANTIES:**

The Operating Agreement shall contain representations and warranties customary for transactions of this type and other terms deemed appropriate by OHP, including with respect to licenses, permits and compliance with law.

**AFFIRMATIVE COVENANTS:**

The affirmative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, the following: delivery of monthly, quarterly and annual financial statements of Coast and PurchaseCo; annual audits with unqualified opinions of PurchaseCo and Coast; ~~monthly compliance certificates and projections and monthly Funding Base certificates and other information requested by OHP, including materials prepared for and circulated to PurchaseCo's and Coast's boards of directors;~~ delivery of quarterly projections by Coast for OHP's expected advances of Funding Capital; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations ~~and maintenance of any and all applicable licenses with proper authorities~~ by both Coast and PurchaseCo; accuracy of information; maintenance of property and general liability insurance; maintenance of books and records; right of OHP to inspect property and books and records of Coast and PurchaseCo; notices of defaults; and notice of formal service of lawsuits litigation ~~against PurchaseCo and Coast and other material events;~~ continued unrestricted access provided to OHP of all PurchaseCo's bank accounts; use of proceeds of Funding Capital; and all or substantially all of professional time of Coast's senior management devoted to the management of the business of Coast and PurchaseCo.

**NEGATIVE COVENANTS:**

The negative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, limitations on the following (subject to exceptions, as appropriate, to be negotiated and including the specific exceptions set forth herein):

- indebtedness (including guarantee obligations);
- liens;
- fundamental changes (including mergers, consolidations, liquidations, dissolutions, and divisions; changes in fiscal year and changes in line of business; transfers of interests; issuances of securities);
- investments;
- dispositions of assets outside the normal course;
- payment of restricted payments (including dividends and other payments in respect of equity interests);
- ~~negative pledge clauses on the PurchaseCo Parties;~~
- ~~Eligible Receivables will not be funded by any person or entity other than OHP or PurchaseCo using its own internal funds;~~
- ~~Coast, Coast's senior management and principals, and any of their respective affiliates will not participate in any business related to, premised on, or competitive with purchasing debt validation receivables outside of Coast's current business arrangement and its participation with PurchaseCo, nor will Coast or its principals engage in any business~~

OHPLPG00073150

Nonbinding Term Sheet

brokering, trading or selling debt validation receivables outside of PurchaseCo; or

- amendment of material documents.

**EVENTS OF DEFAULT:**

Following an Event of Default (as hereinafter defined), the Commitment shall be reduced to $0, and OHP shall take sole control over PurchaseCo and cause all assets of PurchaseCo, including existing cash and any cash from receivables owned by PurchaseCo, to be distributed directly to OHP until OHP's Funding Capital and Equity Investment are fully repaid. Following full repayment of OHP's Funding Capital and Equity Investment, PurchaseCo's operations and ownership shall revert as if such Event of Default had not occurred. An "Event of Default" includes, without limitation:  nonpayment of fees or other amounts when due under any purchase agreement or the Operating Agreement; representations and warranties set forth in the Operating Agreement becoming incorrect in any material respect; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); occurrence of a default (whether or not resulting in acceleration) under any agreement governing indebtedness, in excess of an amount to be agreed upon, of PurchaseCo; bankruptcy events of PurchaseCo, Coast or Coast's principals; guilty or nolo contendere pleas by PurchaseCo, Coast or any of Coast's principals to any offense; conviction of a criminal offense or civil judgment in excess of $50,000 of PurchaseCo, Coast or any of Coast's principals; and certain ERISA events; material adverse changes that, in OHP's discretion, negatively impact PurchaseCo's or Coast's business prospects; a change of control at either PurchaseCo or Coast; and a meaningful (in OHP's discretion) increase in the volume of complaints filed against PurchaseCo, Coast, or Coast's Affiliates on files held by PurchaseCo, to the BBB, EEOC or other national consumer service.

**EXPENSES AND INDEMNIFICATION:**

PurchaseCo shall pay (a) all expenses of OHP associated with the preparation, execution, delivery and administration of the Operating Agreement, prior Package and File purchase agreements, and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) whether or not the transaction closes, (b) all expenses of OHP (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Operating Agreement and all ongoing business expenses of OHP (including but not limited to administration, tax, legal and accounting), (c) fees and expenses associated with other advisors and professionals engaged by OHP in connection with the PurchaseCo Operating Agreement, and (d) other related expenses incurred by OHP during the due diligence process.

The Operating Agreement will contain standard indemnification and exculpation language related to the members of PurchaseCo.

**GOVERNING LAW:**

This term sheet is, and the Operating Agreement will be, governed by the internal laws of the State of Delaware.

**WAIVER OF JURY TRIAL:**

In the Operating Agreement, each party will agree to a waiver of jury trial substantially similar in form and substance to the following:

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY

CONFIDENTIAL

OHPLPG00073151

Nonbinding Term Sheet

(WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**VENUE:**                          ~~Travis County, Texas~~Orange County, California.

CONFIDENTIAL

OHPLPG00073152

Nonbinding Term Sheet

Each of the parties hereby approves and adopts this Term Sheet as of _____, 2020.

**B.A.T. Inc.**

By: _____
Name: _____
Title: _____

**Coast Processing Principals, individually**

By: _____
Name:  Brian Reale

By: _____
Name:  Asante Bayrooti

By: _____
Name:  Mario Azevedo

**Old Hickory Partners – Coast, LP**

By:        Old Hickory GP, LLC,
           its general partner

By: _____
Name:  Adam C. Blum
Title:   Manager

8                                         CONFIDENTIAL

OHPLPG00073153

Nonbinding Term Sheet

Exhibit A:

B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020

CONFIDENTIAL

OHPLPG00073154

Message

| | |
|---|---|
| **From**: | Tony Diab [tony@coastprocessing.com] |
| on behalf of | Tony Diab <tony@coastprocessing.com> [tony@coastprocessing.com] |
| **Sent**: | 12/18/2020 3:01:39 AM |
| **To**: | Kevin Yu [kevin.yu93@gmail.com] |
| **CC**: | Brian [brian@freedomea.com]; Asante Bayrooti [asante@coastprocessing.com]; Mario Azevedo [mario@azevedo.com]; Adam Blum [AdamBlum@aol.com] |
| **Subject**: | Re: Coast-OHP Term Sheet |
| **Attachments**: | Old Hickory - Coast Processing -Term sheet - December 16, 2020.docx |

All -

Please see Coast's proposed revisions to the term sheet, changes tracked.  If this is acceptable please execute and return and Brian and Asante will do the same.

Thanks!

On Wed, Dec 16, 2020 at 1:54 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or concerns.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com


EXHIBIT 516

Nonbinding Term Sheet

COAST PROCESSING
INDICATIVE SUMMARY OF TERMS AND CONDITIONS

This Indicative Summary of Terms and Conditions is intended only as an outline of certain of the material terms of the proposed operating agreement (the "Operating Agreement") for PurchaseCo, a Delaware limited liability company to be jointly owned and managed by Old Hickory Partners – Coast, L.P. ("OHP") and B.A.T. Inc. dba Coast Processing and its principals Brian Reale, Asante Bayrooti and Mario Azevedo ("Coast," and together with OHP, the "PurchaseCo Parties") and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive documentation for the structure of the Operating Agreement contemplated hereby.

| | |
|---|---|
| **PURCHASECO ENTITY:** | The PurchaseCo Parties will establish PurchaseCo, a Delaware limited liability company to be jointly owned and managed by OHP and Coast for the exclusive purpose of purchasing all future cash flow streams from individual receivables (collectively, "Packages") sourced by Coast and its Affiliates, and to receive cash flows therefrom. |
| **OWNERSHIP:** | Each PurchaseCo Party's respective interest in PurchaseCo ("Ownership Interest") is as follows:<br><br>Coast – 70%<br>OHP – 30% |
| **CAPITALIZATION:** | Prior to commencing operations at PurchaseCo, the PurchaseCo Parties will capitalize PurchaseCo with $300,000.00 of equity, pro rata, according to the Ownership Interests (the "Equity Investment"):<br><br>Coast – $210,000.00<br>OHP – $90,000.00<br><br>One time per month, PurchaseCo can issue an additional capital call request to OHP for the sole purpose of funding the purchase of Eligible Receivables (as hereinafter defined) that PurchaseCo's cash on hand cannot fund (the "Funding Capital"). The PurchaseCo Parties agree that OHP's Ownership Interest in PurchaseCo will not exceed 30%, except in certain circumstances to be described in the Operating Agreement, and is not adjusted by its contributions of Funding Capital.<br><br>OHP's Funding Capital is available over 5 years in the amount of $10 million (the "Commitment"); provided that during the first 6 months starting from the Closing Date (as hereinafter defined), availability of Funding Capital shall be limited to $5 million, and that the first advance of Funding Capital shall be limited to $2 million. Any distributions of Funding Capital to OHP are subject to reinvestment by PurchaseCo to fund additional Eligible Receivables. The Commitment term and size can be increased at OHP's option.<br><br>~~PurchaseCo's ability to call Funding Capital shall be subject to certain restrictions set forth in the Operating Agreement, including the Cost Basis of Eligible Receivables measured as of the last day of the prior month (the "Funding Base"). The Funding Base as of any date of determination shall be an amount equal to 100% of the Cost Basis of Eligible Receivables. The "Cost Basis" of Eligible Receivables refers to the amount paid to Affiliates for a File (as hereinafter defined) or Packages. For the purposes of calculating the Funding Base, Eligible Receivables shall also include any Files or Packages contracted with Affiliates and approved for purchase by PurchaseCo in the current month. To the extent that the outstanding amount of the Funding Capital exceeds the Funding Base (a "Funding Base Deficiency"), PurchaseCo~~ |

1

CONFIDENTIAL

[DOCPROPERTY DOCXDOCID DMS=NetDocuments Format=<<ID>>v.<<VER>> <<Client>>-<<Matter>> PRESERVELOCATION]

OHPLPG00073156

Nonbinding Term Sheet

~~shall immediately pay OHP in an amount sufficient to eliminate the Funding Base Deficiency.~~

~~"Eligible Receivables" shall mean a payment stream from a File (or collectively, a Package for a given month) that satisfies each of the following conditions, unless expressly waived in advance by OHP, for any specific purchase: (a) such receivable has had at least its first payment made, and (b) such receivable has a purchase cost of less than the lesser of (1) 40% of the total expected cash flows to be collected over the term of the File or Package (prior to management fee or cancellations), or (2) 7.5% of the total gross balance of debt enrolled per File or Package.~~

**CONDITIONS PRECEDENT:**

The creation of PurchaseCo will be subject to satisfaction of the conditions precedent deemed appropriate by OHP for the an alignment of interest between the PurchaseCo Parties, including, but not limited to, the following:

Coast shall certify that its principals individually and their other Package-buying entities, including but not limited to ABR Enterprises, LLC, Freedom Enrollment, and any trusts or entities owned, managed by, or for the benefit of Coast's principals or their affiliates (the "Coast Entities"), shall not engage in the purchase of any new Packages that meet the criteria of an Eligible Receivable, unless OHP first declines to provide Funding Capital for the specific Package. The Coast Entities in aggregate shall not, in any event, purchase more than $300,000.00 in new Packages in any consecutive 3 month period, measured on the last day of a given month.

The execution of the Operating Agreement will also be subject to satisfaction of the conditions precedent deemed appropriate by OHP for transactions of this type generally and for this transaction in particular, including, but not limited to, the following:

- OHP shall have received from PurchaseCo all fees required to be paid and all expenses for which invoices have been presented.

- All governmental and third party approvals necessary in connection with the transaction(s) contemplated hereby and the continuing operations of PurchaseCo, Coast and its subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

- OHP shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, organizational documents, consents, and financing statements or similar filings, all in form and substance acceptable to OHP and its counsel.

- The organizational, capital structure, debt instruments, material accounts and governing documents of Coast and PurchaseCo and their affiliates shall be acceptable to OHP.

The date on which the PurchaseCo Parties execute the Operating Agreement shall be referred to as the "Closing Date."

**PURCHASECO OPERATIONS:**

PurchaseCo will purchase at cost (no mark-up), from lead generating and marketing companies affiliated with Coast ("Affiliates"), cash flow streams that represent the Affiliate's interest in customer payments for debt validation services ("Files"). All Files purchased within a calendar month will be

2                                    CONFIDENTIAL

Nonbinding Term Sheet

collectively called a "Package." Files will be funded from the following capital sources of PurchaseCo, in order of availability:

1) Available cash on hand at PurchaseCo (retaining a minimum Cash (as hereinafter defined) balance of $25,000.00 at all times);

2) Funding Capital, up to the Commitment amount (one draw per month maximum); and

3) Equity infusion from the PurchaseCo Parties in proportion to the Ownership Interests.

Coast will manage the day-to-day operations of PurchaseCo and will administer all Package collections and management of the Files, with the help of a fund administrator (to be hired by PurchaseCo if so requested by OHP). Collections and management will operate substantially similar to the collections and management of current Packages of Files sold to third parties and as detailed in that certain B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020 (Exhibit A), including, but not limited to, the monthly maintenance fee and refund clawback mechanics. At any time, OHP may request that PurchaseCo and Coast engage a backup servicer to onboard in preparation for one day taking over PurchaseCo's servicing and collections should, in OHP's determination, Coast not be able to fulfill such duties. Any commission income due or received by any of Coast, Coast's principals, or its affiliates, related to the purchase of Files or Packages funded by PurchaseCo, shall be contributed to PurchaseCo and deemed income of PurchaseCo and not part of Coast's equity contributions to PurchaseCo. Should Coast or its affiliates ever create an Affiliate or any other similar entity or joint venture (such business to be determined to be an Affiliate or similar business in OHP's reasonable discretion) that is owned or managed, directly or indirectly, by Coast or its principals or affiliates, PurchaseCo shall own a no-cost ownership interest in such Affiliate amounting to 30% and shall have no capital contribution requirements thereto nor any share of liabilities therefrom.

Each of OHP and Coast will appoint a manager to represent its interests at PurchaseCo. Authorization from both Managers representing the PurchaseCo Parties shall be required for certain business operations including, but not limited to, bank outflows (dual authorization required for any disbursements), debt drawdowns, debt prepayments, equity distributions, any issues of debt or equity or issuance/purchase of securities, annual budgeting, tax matters, any acquisition or sale of assets (except in the normal course), initiation or responses to any litigation, and other major activities deemed as such by OHP in its reasonable discretion (collectively "Major Decisions"). The PurchaseCo Parties hereby agree that the exclusive capital provider to PurchaseCo shall be OHP and its assigns, Coast, and Coast's principals.

**RIGHT OF FIRST REFUSAL:** For so long as PurchaseCo has not been wound down, PurchaseCo will have a right of first offer for any and all Files related to a Coast customer or that of a Coast Affiliate. Should PurchaseCo decline to fund payments associated with a specific File, then the File may be offered to unaffiliated third-party investors. At no point in time can Coast, its subsidiaries, or its affiliates, other than PurchaseCo, be offered a File or cash flows therefrom, except as noted in the Conditions Precedent section above.

**DISTRIBUTIONS:** At such time as a distribution is made by PurchaseCo to the PurchaseCo Parties, the "waterfall" would work as follows:

3                                    CONFIDENTIAL

OHPLPG00073158

Nonbinding Term Sheet

1. First, to OHP until such time as OHP has received a return of all Funding Capital contributed to PurchaseCo;
2. Next, to OHP until such time as OHP has received a return of its Equity Investment in PurchaseCo;
3. Next, to Coast until Coast has received a return of all of its Equity Investment in PurchaseCo; and
4. Thereafter, to the PurchaseCo Parties pro rata according to Ownership Interests.

**SECURITY:** ~~PurchaseCo will be granted a second priority lien on the office building to be purchased by Coast and any other physical property thereafter purchased by Coast. If at any time a first lien on such property is repaid in full and terminated, PurchaseCo shall have a first priority lien.~~

**CONDITIONS PRECEDENT TO EACH ADVANCE OF FUNDING CAPITAL:** ~~In advance of each funding request, Coast agrees to furnish to OHP, with adequate notice, a report, in a form to be agreed upon by the PurchaseCo Parties, which includes but is not limited to historical and projected performance statistics of Files purchased, organized by Affiliate. Funding of each Funding Capital advance request is subject to OHP's receipt of and approval of such report, such approval not to be unreasonably withheld. Any nonresponse within a specified period of time by OHP is deemed to be an approval of such report.~~

~~The making of each monthly contribution of Funding Capital shall further be conditioned upon (a) the accuracy of all representations and warranties in the Operating Agreement (including, without limitation, the material adverse change and litigation representations); (b) there being no breach of any covenants in the Operating Agreement nor any Events of Default (as further defined below) in existence at the time of, or after giving effect to the making of, such contributions of Funding Capital; (c) there being no material adverse change in PurchaseCo's or Coast's business in existence at the time of, or after giving effect to the making of, such Funding Capital advance; and (d) after giving effect to the contribution of Funding Capital, the total outstanding balance of the Funding Capital to PurchaseCo shall not exceed the lesser of the Commitment or the Funding Base then in effect.~~

**FUNDING CAPITAL COVENANTS:** The financial covenants under the Operating Agreement governing the Funding Capital shall be as follows:

- ~~PurchaseCo shall not permit the Cancellation Rate (as hereinafter defined) of any monthly Package, or across all owned Files, to be greater than 25%, tested at the end of each calendar month; and~~

- PurchaseCo's Cash balance shall at all times be at least $25,000.00.

~~"Cancellation Rate" means, as of any date of determination thereof, an amount, expressed as a percentage, equal to (a) the total dollar amount of undiscounted expected future cash flows from Files cancelled, written off, or greater than 60 days overdue, divided by (b) the total dollar amount of undiscounted received and expected future cash flows from all Files.~~

"Cash" shall mean cash or cash equivalents of a person, (a) that are not, and are not required to be, designated as "restricted" on the financial statements of such person, (b) that are not contractually required, and have not been contractually committed by such person, to be used for a specific purpose, (c) that are not subject to (i) any provision of law, statute, rule or regulation, (ii) any provision of the organizational documents of such person, or (iii) any order of any

4                              CONFIDENTIAL

OHPLPG00073159

Nonbinding Term Sheet

governmental authority, (d) in which no person has a lien, and (e) that are held in a deposit account or securities account, as applicable, in which OHP has direct access.

**REPRESENTATIONS AND WARRANTIES:**

The Operating Agreement shall contain representations and warranties customary for transactions of this type and other terms deemed appropriate by OHP, including with respect to licenses, permits and compliance with law.

**AFFIRMATIVE COVENANTS:**

The affirmative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, the following: delivery of monthly, quarterly and annual financial statements of Coast and PurchaseCo; annual audits with unqualified opinions of PurchaseCo and Coast; monthly compliance certificates and projections and monthly Funding Base certificates and other information requested by OHP, including materials prepared for and circulated to PurchaseCo's and Coast's boards of directors; delivery of quarterly projections by Coast for OHP's expected advances of Funding Capital; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations and maintenance of any and all applicable licenses with proper authorities by both Coast and PurchaseCo; accuracy of information; maintenance of property and general liability insurance; maintenance of books and records; right of OHP to inspect property and books and records of Coast and PurchaseCo; notices of defaults, litigation against PurchaseCo and Coast and other material events; continued unrestricted access provided to OHP of all PurchaseCo's bank accounts; use of proceeds of Funding Capital; and all or substantially all of professional time of Coast's senior management devoted to the management of the business of Coast and PurchaseCo.

**NEGATIVE COVENANTS:**

The negative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, limitations on the following (subject to exceptions, as appropriate, to be negotiated and including the specific exceptions set forth herein):

- indebtedness (including guarantee obligations);
- liens;
- fundamental changes (including mergers, consolidations, liquidations, dissolutions, and divisions; changes in fiscal year and changes in line of business; transfers of interests; issuances of securities);
- investments;
- dispositions of assets outside the normal course;
- payment of restricted payments (including dividends and other payments in respect of equity interests);
- negative pledge clauses on the PurchaseCo Parties;
- Eligible Receivables will not be funded by any person or entity other than OHP or PurchaseCo using its own internal funds;
- Coast, Coast's senior management and principals, and any of their respective affiliates will not participate in any business related to, premised on, or competitive with purchasing debt validation receivables outside of Coast's current business arrangement and its participation with PurchaseCo, nor will Coast or its principals engage in any business brokering, trading or selling debt validation receivables outside of PurchaseCo; or

CONFIDENTIAL

OHPLPG00073160

Nonbinding Term Sheet

- amendment of material documents.

**EVENTS OF DEFAULT:** Following an Event of Default (as hereinafter defined), the Commitment shall be reduced to $0, and OHP shall take sole control over PurchaseCo and cause all assets of PurchaseCo, including existing cash and any cash from receivables owned by PurchaseCo, to be distributed directly to OHP until OHP's Funding Capital and Equity Investment are fully repaid. Following full repayment of OHP's Funding Capital and Equity Investment, PurchaseCo's operations and ownership shall revert as if such Event of Default had not occurred. An "Event of Default" includes, without limitation: nonpayment of fees or other amounts when due under any purchase agreement or the Operating Agreement; ~~representations and warranties set forth in the Operating Agreement becoming incorrect in any material respect;~~ violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); ~~occurrence of a default (whether or not resulting in acceleration) under any agreement governing indebtedness, in excess of an amount to be agreed upon, of PurchaseCo;~~ bankruptcy events of PurchaseCo, Coast or Coast's principals; guilty or nolo contendere pleas by PurchaseCo, Coast or any of Coast's principals to any offense; conviction of a criminal offense or civil judgment in excess of $50,000 of PurchaseCo, Coast or any of Coast's principals; certain ERISA events; ~~material adverse changes that, in OHP's discretion, negatively impact PurchaseCo's or Coast's business prospects; a change of control at either PurchaseCo or Coast; and a meaningful (in OHP's discretion) increase in the volume of complaints filed against PurchaseCo, Coast, or Coast's Affiliates on files held by PurchaseCo, to the BBB, EEOC or other national consumer service~~.

**EXPENSES AND INDEMNIFICATION:** PurchaseCo shall pay (a) all expenses of OHP associated with the preparation, execution, delivery and administration of the Operating Agreement, prior Package and File purchase agreements, and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) whether or not the transaction closes, (b) all expenses of OHP (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Operating Agreement and all ongoing business expenses of OHP (including but not limited to administration, tax, legal and accounting), (c) fees and expenses associated with other advisors and professionals engaged by OHP in connection with the PurchaseCo Operating Agreement, and (d) other related expenses incurred by OHP during the due diligence process.

The Operating Agreement will contain standard indemnification and exculpation language related to the members of PurchaseCo.

**GOVERNING LAW:** This term sheet is, and the Operating Agreement will be, governed by the internal laws of the State of Delaware.

**WAIVER OF JURY TRIAL:** In the Operating Agreement, each party will agree to a waiver of jury trial substantially similar in form and substance to the following:

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE,

CONFIDENTIAL

OHPLPG00073161

Nonbinding Term Sheet

AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**VENUE:**                    ~~Travis County, Texas~~Orange County, California.

CONFIDENTIAL

OHPLPG00073162

Nonbinding Term Sheet

Each of the parties hereby approves and adopts this Term Sheet as of _____, 2020.

**B.A.T. Inc.**

By: _____
Name: _____
Title: _____

**Coast Processing Principals, individually**

By: _____
Name:  Brian Reale

By: _____
Name:  Asante Bayrooti

By: _____
Name:  Mario Azevedo

**Old Hickory Partners – Coast, LP**

By:        Old Hickory GP, LLC,
           its general partner

By: _____
Name:  Adam C. Blum
Title:   Manager

8                                    CONFIDENTIAL

OHPLPG00073163

Nonbinding Term Sheet

<u>Exhibit A:</u>

<u>B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020</u>

CONFIDENTIAL

OHPLPG00073164

Message

| | |
|---|---|
| **From**: | Kevin Yu [kevin.yu93@gmail.com] |
| on behalf of | Kevin Yu <kevin.yu93@gmail.com> [kevin.yu93@gmail.com] |
| **Sent**: | 12/17/2020 8:10:53 PM |
| **To**: | Tony Diab [tony@coastprocessing.com] |
| **Subject**: | Re: Coast-OHP Term Sheet |
| **Attachments**: | Old Hickory - Coast Processing -Term sheet - December 16, 2020.docx |

Sure. See attached.


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


On Thu, Dec 17, 2020 at 1:43 PM Tony Diab <tony@coastprocessing.com> wrote:
Hi Kevin -

Can you send as a word document, a few proposed revisions.

Thanks!

On Wed, Dec 16, 2020 at 1:54 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or concerns.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897
--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com


EXHIBIT 517

OHPLPG00073165

Nonbinding Term Sheet

COAST PROCESSING

INDICATIVE SUMMARY OF TERMS AND CONDITIONS

This Indicative Summary of Terms and Conditions is intended only as an outline of certain of the material terms of the proposed operating agreement (the "Operating Agreement") for PurchaseCo, a Delaware limited liability company to be jointly owned and managed by Old Hickory Partners – Coast, L.P. ("OHP") and B.A.T. Inc. dba Coast Processing and its principals Brian Reale, Asante Bayrooti and Mario Azevedo ("Coast," and together with OHP, the "PurchaseCo Parties") and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive documentation for the structure of the Operating Agreement contemplated hereby.

**PURCHASECO ENTITY:** The PurchaseCo Parties will establish PurchaseCo, a Delaware limited liability company to be jointly owned and managed by OHP and Coast for the exclusive purpose of purchasing all future cash flow streams from individual receivables (collectively, "Packages") sourced by Coast and its Affiliates, and to receive cash flows therefrom.

**OWNERSHIP:** Each PurchaseCo Party's respective interest in PurchaseCo ("Ownership Interest") is as follows:

Coast – 70%
OHP – 30%

**CAPITALIZATION:** Prior to commencing operations at PurchaseCo, the PurchaseCo Parties will capitalize PurchaseCo with $300,000.00 of equity, pro rata, according to the Ownership Interests (the "Equity Investment"):

Coast – $210,000.00
OHP – $90,000.00

One time per month, PurchaseCo can issue an additional capital call request to OHP for the sole purpose of funding the purchase of Eligible Receivables (as hereinafter defined) that PurchaseCo's cash on hand cannot fund (the "Funding Capital"). The PurchaseCo Parties agree that OHP's Ownership Interest in PurchaseCo will not exceed 30%, except in certain circumstances to be described in the Operating Agreement, and is not adjusted by its contributions of Funding Capital.

OHP's Funding Capital is available over 5 years in the amount of $10 million (the "Commitment"); provided that during the first 6 months starting from the Closing Date (as hereinafter defined), availability of Funding Capital shall be limited to $5 million, and that the first advance of Funding Capital shall be limited to $2 million. Any distributions of Funding Capital to OHP are subject to reinvestment by PurchaseCo to fund additional Eligible Receivables. The Commitment term and size can be increased at OHP's option.

PurchaseCo's ability to call Funding Capital shall be subject to certain restrictions set forth in the Operating Agreement, including the Cost Basis of Eligible Receivables measured as of the last day of the prior month (the "Funding Base"). The Funding Base as of any date of determination shall be an amount equal to 100% of the Cost Basis of Eligible Receivables. The "Cost Basis" of Eligible Receivables refers to the amount paid to Affiliates for a File (as hereinafter defined) or Packages. For the purposes of calculating the Funding Base, Eligible Receivables shall also include any Files or Packages contracted with Affiliates and approved for purchase by PurchaseCo in the current month. To the extent that the outstanding amount of the Funding Capital exceeds the Funding Base (a "Funding Base Deficiency"), PurchaseCo

1                                                    CONFIDENTIAL

Nonbinding Term Sheet

shall immediately pay OHP in an amount sufficient to eliminate the Funding Base Deficiency.

"Eligible Receivables" shall mean a payment stream from a File (or collectively, a Package for a given month) that satisfies each of the following conditions, unless expressly waived in advance by OHP, for any specific purchase: (a) such receivable has had at least its first payment made, and (b) such receivable has a purchase cost of less than the lesser of (1) 40% of the total expected cash flows to be collected over the term of the File or Package (prior to management fee or cancellations), or (2) 7.5% of the total gross balance of debt enrolled per File or Package.

**CONDITIONS PRECEDENT:**

The creation of PurchaseCo will be subject to satisfaction of the conditions precedent deemed appropriate by OHP for the an alignment of interest between the PurchaseCo Parties, including, but not limited to, the following:

Coast shall certify that its principals individually and their other Package-buying entities, including but not limited to ABR Enterprises, LLC, Freedom Enrollment, and any trusts or entities owned, managed by, or for the benefit of Coast's principals or their affiliates (the "Coast Entities"), shall not engage in the purchase of any new Packages that meet the criteria of an Eligible Receivable, unless OHP first declines to provide Funding Capital for the specific Package. The Coast Entities in aggregate shall not, in any event, purchase more than $300,000.00 in new Packages in any consecutive 3 month period, measured on the last day of a given month.

The execution of the Operating Agreement will also be subject to satisfaction of the conditions precedent deemed appropriate by OHP for transactions of this type generally and for this transaction in particular, including, but not limited to, the following:

- OHP shall have received from PurchaseCo all fees required to be paid and all expenses for which invoices have been presented.

- All governmental and third party approvals necessary in connection with the transaction(s) contemplated hereby and the continuing operations of PurchaseCo, Coast and its subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

- OHP shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, organizational documents, consents, and financing statements or similar filings, all in form and substance acceptable to OHP and its counsel.

- The organizational, capital structure, debt instruments, material accounts and governing documents of Coast and PurchaseCo and their affiliates shall be acceptable to OHP.

The date on which the PurchaseCo Parties execute the Operating Agreement shall be referred to as the "Closing Date."

**PURCHASECO OPERATIONS:**

PurchaseCo will purchase at cost (no mark-up), from lead generating and marketing companies affiliated with Coast ("Affiliates"), cash flow streams that represent the Affiliate's interest in customer payments for debt validation services ("Files"). All Files purchased within a calendar month will be

CONFIDENTIAL

OHPLPG00073167

Nonbinding Term Sheet

collectively called a "Package."  Files will be funded from the following capital sources of PurchaseCo, in order of availability:

1) Available cash on hand at PurchaseCo (retaining a minimum Cash (as hereinafter defined) balance of $25,000.00 at all times);

2) Funding Capital, up to the Commitment amount (one draw per month maximum); and

3) Equity infusion from the PurchaseCo Parties in proportion to the Ownership Interests.

Coast will manage the day-to-day operations of PurchaseCo and will administer all Package collections and management of the Files, with the help of a fund administrator (to be hired by PurchaseCo if so requested by OHP). Collections and management will operate substantially similar to the collections and management of current Packages of Files sold to third parties and as detailed in that certain B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020 (Exhibit A), including, but not limited to, the monthly maintenance fee and refund clawback mechanics.  At any time, OHP may request that PurchaseCo and Coast engage a backup servicer to onboard in preparation for one day taking over PurchaseCo's servicing and collections should, in OHP's determination, Coast not be able to fulfill such duties.  Any commission income due or received by any of Coast, Coast's principals,  or its affiliates,  related to the purchase of Files or Packages funded by PurchaseCo, shall be contributed to PurchaseCo and deemed income of PurchaseCo and not part of Coast's equity contributions to PurchaseCo.  Should Coast or its affiliates ever create an Affiliate or any other similar entity or joint venture  (such business to be determined to be an Affiliate or similar business in OHP's reasonable discretion) that is owned or managed, directly or indirectly, by Coast or its principals or affiliates, PurchaseCo shall own a no-cost ownership interest in such Affiliate amounting to 30% and shall have no capital contribution requirements thereto nor any share of liabilities therefrom.

Each of OHP and Coast will appoint a manager to represent its interests at PurchaseCo.  Authorization from both Managers representing the PurchaseCo Parties shall be required for certain business operations including, but not limited to, bank outflows (dual authorization required for any disbursements), debt drawdowns, debt prepayments, equity distributions, any raises of debt or equity or issuance/purchase of securities, annual budgeting, tax matters, any acquisition or sale of assets (except in the normal course), initiation or responses to any litigation, and other major activities deemed as such by OHP in its reasonable discretion (collectively "Major Decisions").  The PurchaseCo Parties hereby agree that the exclusive capital provider to PurchaseCo shall be OHP and its assigns, Coast, and Coast's principals.

**RIGHT OF FIRST REFUSAL:**

For so long as PurchaseCo has not been wound down, PurchaseCo will have a right of first offer for any and all Files related to a Coast customer or that of a Coast Affiliate.  Should PurchaseCo decline to fund payments associated with a specific File, then the File may be offered to unaffiliated third-party investors. At no point in time can Coast, its subsidiaries, or its affiliates, other than PurchaseCo, be offered a File or cash flows therefrom, except as noted in the Conditions Precedent section above.

**DISTRIBUTIONS:**

At such time as a distribution is made by PurchaseCo to the PurchaseCo Parties, the "waterfall" would work as follows:

3                              CONFIDENTIAL

OHPLPG00073168

Nonbinding Term Sheet

1.  First, to OHP until such time as OHP has received a return of all Funding Capital contributed to PurchaseCo;
2.  Next, to OHP until such time as OHP has received a return of its Equity Investment in PurchaseCo;
3.  Next, to Coast until Coast has received a return of all of its Equity Investment in PurchaseCo; and
4.  Thereafter, to the PurchaseCo Parties pro rata according to Ownership Interests.

**SECURITY:**   PurchaseCo will be granted a second priority lien on the office building to be purchased by Coast and any other physical property thereafter purchased by Coast. If at any time a first lien on such property is repaid in full and terminated, PurchaseCo shall have a first priority lien.

**CONDITIONS PRECEDENT TO EACH ADVANCE OF FUNDING CAPITAL:**   In advance of each funding request, Coast agrees to furnish to OHP, with adequate notice, a report, in a form to be agreed upon by the PurchaseCo Parties, which includes but is not limited to historical and projected performance statistics of Files purchased, organized by Affiliate. Funding of each Funding Capital advance request is subject to OHP's receipt of and approval of such report, such approval not to be unreasonably withheld. Any nonresponse within a specified period of time by OHP is deemed to be an approval of such report.

The making of each monthly contribution of Funding Capital shall further be conditioned upon (a) the accuracy of all representations and warranties in the Operating Agreement (including, without limitation, the material adverse change and litigation representations); (b) there being no breach of any covenants in the Operating Agreement nor any Events of Default (as further defined below) in existence at the time of, or after giving effect to the making of, such contributions of Funding Capital; (c) there being no material adverse change in PurchaseCo's or Coast's business in existence at the time of, or after giving effect to the making of, such Funding Capital advance; and (d) after giving effect to the contribution of Funding Capital, the total outstanding balance of the Funding Capital to PurchaseCo shall not exceed the lesser of the Commitment or the Funding Base then in effect.

**FUNDING CAPITAL COVENANTS:**   The financial covenants under the Operating Agreement governing the Funding Capital shall be as follows:

- PurchaseCo shall not permit the Cancellation Rate (as hereinafter defined) of any monthly Package, or across all owned Files, to be greater than 25%, tested at the end of each calendar month; and

- PurchaseCo's Cash balance shall at all times be at least $25,000.00.

"Cancellation Rate" means, as of any date of determination thereof, an amount, expressed as a percentage, equal to (a) the total dollar amount of undiscounted expected future cash flows from Files cancelled, written off, or greater than 60 days overdue, divided by (b) the total dollar amount of undiscounted received and expected future cash flows from all Files.

"Cash" shall mean cash or cash equivalents of a person, (a) that are not, and are not required to be, designated as "restricted" on the financial statements of such person, (b) that are not contractually required, and have not been contractually committed by such person, to be used for a specific purpose, (c) that are not subject to (i) any provision of law, statute, rule or regulation, (ii) any provision of the organizational documents of such person, or (iii) any order of any

4                                            CONFIDENTIAL

OHPLPG00073169

Nonbinding Term Sheet

governmental authority, (d) in which no person has a lien, and (e) that are held in a deposit account or securities account, as applicable, in which OHP has direct access.

**REPRESENTATIONS AND WARRANTIES:**

The Operating Agreement shall contain representations and warranties customary for transactions of this type and other terms deemed appropriate by OHP, including with respect to licenses, permits and compliance with law.

**AFFIRMATIVE COVENANTS:**

The affirmative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, the following: delivery of monthly, quarterly and annual financial statements of Coast and PurchaseCo; annual audits with unqualified opinions of PurchaseCo and Coast; monthly compliance certificates and projections and monthly Funding Base certificates and other information requested by OHP, including materials prepared for and circulated to PurchaseCo's and Coast's boards of directors; delivery of quarterly projections by Coast for OHP's expected advances of Funding Capital; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations and maintenance of any and all applicable licenses with proper authorities by both Coast and PurchaseCo; accuracy of information; maintenance of property and general liability insurance; maintenance of books and records; right of OHP to inspect property and books and records of Coast and PurchaseCo; notices of defaults, litigation against PurchaseCo and Coast and other material events; continued unrestricted access provided to OHP of all PurchaseCo's bank accounts; use of proceeds of Funding Capital; and all or substantially all of professional time of Coast's senior management devoted to the management of the business of Coast and PurchaseCo.

**NEGATIVE COVENANTS:**

The negative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, limitations on the following (subject to exceptions, as appropriate, to be negotiated and including the specific exceptions set forth herein):

- indebtedness (including guarantee obligations);
- liens;
- fundamental changes (including mergers, consolidations, liquidations, dissolutions, and divisions; changes in fiscal year and changes in line of business; transfers of interests; issuances of securities);
- investments;
- dispositions of assets outside the normal course;
- payment of restricted payments (including dividends and other payments in respect of equity interests);
- negative pledge clauses on the PurchaseCo Parties;
- Eligible Receivables will not be funded by any person or entity other than OHP or PurchaseCo using its own internal funds;
- Coast, Coast's senior management and principals, and any of their respective affiliates will not participate in any business related to, premised on, or competitive with purchasing debt validation receivables outside of Coast's current business arrangement and its participation with PurchaseCo, nor will Coast or its principals engage in any business brokering, trading or selling debt validation receivables outside of PurchaseCo; or

5                                    CONFIDENTIAL

OHPLPG00073170

Nonbinding Term Sheet

- amendment of material documents.

**EVENTS OF DEFAULT:** Following an Event of Default (as hereinafter defined), the Commitment shall be reduced to $0, and OHP shall take sole control over PurchaseCo and cause all assets of PurchaseCo, including existing cash and any cash from receivables owned by PurchaseCo, to be distributed directly to OHP until OHP's Funding Capital and Equity Investment are fully repaid. Following full repayment of OHP's Funding Capital and Equity Investment, PurchaseCo's operations and ownership shall revert as if such Event of Default had not occurred. An "Event of Default" includes, without limitation: nonpayment of fees or other amounts when due under any purchase agreement or the Operating Agreement; representations and warranties set forth in the Operating Agreement becoming incorrect in any material respect; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); occurrence of a default (whether or not resulting in acceleration) under any agreement governing indebtedness, in excess of an amount to be agreed upon, of PurchaseCo; bankruptcy events of PurchaseCo, Coast or Coast's principals; guilty or nolo contendere pleas by PurchaseCo, Coast or any of Coast's principals to any offense; conviction of a criminal offense or civil judgment in excess of $50,000 of PurchaseCo, Coast or any of Coast's principals; certain ERISA events; material adverse changes that, in OHP's discretion, negatively impact PurchaseCo's or Coast's business prospects; a change of control at either PurchaseCo or Coast; and a meaningful (in OHP's discretion) increase in the volume of complaints filed against PurchaseCo, Coast, or Coast's Affiliates on files held by PurchaseCo, to the BBB, EEOC or other national consumer service.

**EXPENSES AND INDEMNIFICATION:** PurchaseCo shall pay (a) all expenses of OHP associated with the preparation, execution, delivery and administration of the Operating Agreement, prior Package and File purchase agreements, and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) whether or not the transaction closes, (b) all expenses of OHP (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Operating Agreement and all ongoing business expenses of OHP (including but not limited to administration, tax, legal and accounting), (c) fees and expenses associated with other advisors and professionals engaged by OHP in connection with the PurchaseCo Operating Agreement, and (d) other related expenses incurred by OHP during the due diligence process.

The Operating Agreement will contain standard indemnification and exculpation language related to the members of PurchaseCo.

**GOVERNING LAW:** This term sheet is, and the Operating Agreement will be, governed by the internal laws of the State of Delaware.

**WAIVER OF JURY TRIAL:** In the Operating Agreement, each party will agree to a waiver of jury trial substantially similar in form and substance to the following:

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE,

CONFIDENTIAL

OHPLPG00073171

Nonbinding Term Sheet

AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**VENUE:**               Travis County, Texas.

CONFIDENTIAL

OHPLPG00073172

Nonbinding Term Sheet

Each of the parties hereby approves and adopts this Term Sheet as of _____, 2020.

**B.A.T. Inc.**

By: _____
Name: _____
Title: _____

**Coast Processing Principals, individually**

By: _____
Name:  Brian Reale

By: _____
Name:  Asante Bayrooti

By: _____
Name:  Mario Azevedo

**Old Hickory Partners – Coast, LP**

By:        Old Hickory GP, LLC,
              its general partner

By: _____
Name:  Adam C. Blum
Title:   Manager

8                                          CONFIDENTIAL

OHPLPG00073173

Nonbinding Term Sheet

<u>Exhibit A:</u>

<u>B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020</u>

9                                    CONFIDENTIAL

OHPLPG00073174

Message

| | |
|---|---|
| **From**: | Tony Diab [tony@coastprocessing.com] |
| on behalf of | Tony Diab <tony@coastprocessing.com> [tony@coastprocessing.com] |
| **Sent**: | 12/17/2020 7:43:24 PM |
| **To**: | Kevin Yu [kevin.yu93@gmail.com] |
| **Subject**: | Re: Coast-OHP Term Sheet |

Hi Kevin -

Can you send as a word document, a few proposed revisions.

Thanks!

On Wed, Dec 16, 2020 at 1:54 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or concerns.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897
--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

EXHIBIT 518

OHPLPG00073175

Message

| | |
|---|---|
| **From**: | Kevin Yu [kevin.yu93@gmail.com] |
| on behalf of | Kevin Yu <kevin.yu93@gmail.com> [kevin.yu93@gmail.com] |
| **Sent**: | 12/16/2020 9:54:09 PM |
| **To**: | Brian [brian@freedomea.com]; Asante Bayrooti [asante@coastprocessing.com]; Mario Azevedo [mario@azevedo.com]; Tony Diab [tony@coastprocessing.com] |
| **CC**: | Adam Blum [AdamBlum@aol.com] |
| **Subject**: | Coast-OHP Term Sheet |
| **Attachments**: | Old Hickory - Coast Processing -Term sheet - December 16, 2020.pdf |

Hi all,

Happy to share with y'all the term sheet. I believe we've gone through almost every bit of this at least verbally so there shouldn't be any surprises. Please let us know if y'all have any questions, comments, or concerns.

Thanks,


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

EXHIBIT 519

OHPLPG00073176

Nonbinding Term Sheet

COAST PROCESSING
INDICATIVE SUMMARY OF TERMS AND CONDITIONS

This Indicative Summary of Terms and Conditions is intended only as an outline of certain of the material terms of the proposed operating agreement (the "Operating Agreement") for PurchaseCo, a Delaware limited liability company to be jointly owned and managed by Old Hickory Partners – Coast, L.P. ("OHP") and B.A.T. Inc. dba Coast Processing and its principals Brian Reale, Asante Bayrooti and Mario Azevedo ("Coast," and together with OHP, the "PurchaseCo Parties") and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive documentation for the structure of the Operating Agreement contemplated hereby.

| | |
|---|---|
| **PURCHASECO ENTITY:** | The PurchaseCo Parties will establish PurchaseCo, a Delaware limited liability company to be jointly owned and managed by OHP and Coast for the exclusive purpose of purchasing all future cash flow streams from individual receivables (collectively, "Packages") sourced by Coast and its Affiliates, and to receive cash flows therefrom. |
| **OWNERSHIP:** | Each PurchaseCo Party's respective interest in PurchaseCo ("Ownership Interest") is as follows:<br><br>Coast – 70%<br>OHP – 30% |
| **CAPITALIZATION:** | Prior to commencing operations at PurchaseCo, the PurchaseCo Parties will capitalize PurchaseCo with $300,000.00 of equity, pro rata, according to the Ownership Interests (the "Equity Investment"):<br><br>Coast – $210,000.00<br>OHP – $90,000.00<br><br>One time per month, PurchaseCo can issue an additional capital call request to OHP for the sole purpose of funding the purchase of Eligible Receivables (as hereinafter defined) that PurchaseCo's cash on hand cannot fund (the "Funding Capital"). The PurchaseCo Parties agree that OHP's Ownership Interest in PurchaseCo will not exceed 30%, except in certain circumstances to be described in the Operating Agreement, and is not adjusted by its contributions of Funding Capital.<br><br>OHP's Funding Capital is available over 5 years in the amount of $10 million (the "Commitment"); provided that during the first 6 months starting from the Closing Date (as hereinafter defined), availability of Funding Capital shall be limited to $5 million, and that the first advance of Funding Capital shall be limited to $2 million.  Any distributions of Funding Capital to OHP are subject to reinvestment by PurchaseCo to fund additional Eligible Receivables. The Commitment term and size can be increased at OHP's option.<br><br>PurchaseCo's ability to call Funding Capital shall be subject to certain restrictions set forth in the Operating Agreement, including the Cost Basis of Eligible Receivables measured as of the last day of the prior month (the "Funding Base"). The Funding Base as of any date of determination shall be an amount equal to 100% of the Cost Basis of Eligible Receivables. The "Cost Basis" of Eligible Receivables refers to the amount paid to Affiliates for a File (as hereinafter defined) or Packages.  For the purposes of calculating the Funding Base, Eligible Receivables shall also include any Files or Packages contracted with Affiliates and approved for purchase by PurchaseCo in the current month.  To the extent that the outstanding amount of the Funding Capital exceeds the Funding Base (a "Funding Base Deficiency"), PurchaseCo |

4811-7258-7475v.2 62697-19

OHPLPG00073177

Nonbinding Term Sheet

shall immediately pay OHP in an amount sufficient to eliminate the Funding Base Deficiency.

"Eligible Receivables" shall mean a payment stream from a File (or collectively, a Package for a given month) that satisfies each of the following conditions, unless expressly waived in advance by OHP, for any specific purchase: (a) such receivable has had at least its first payment made, and (b) such receivable has a purchase cost of less than the lesser of (1) 40% of the total expected cash flows to be collected over the term of the File or Package (prior to management fee or cancellations), or (2) 7.5% of the total gross balance of debt enrolled per File or Package.

**CONDITIONS PRECEDENT:**

The creation of PurchaseCo will be subject to satisfaction of the conditions precedent deemed appropriate by OHP for the an alignment of interest between the PurchaseCo Parties, including, but not limited to, the following:

Coast shall certify that its principals individually and their other Package-buying entities, including but not limited to ABR Enterprises, LLC, Freedom Enrollment, and any trusts or entities owned, managed by, or for the benefit of Coast's principals or their affiliates (the "Coast Entities"), shall not engage in the purchase of any new Packages that meet the criteria of an Eligible Receivable, unless OHP first declines to provide Funding Capital for the specific Package. The Coast Entities in aggregate shall not, in any event, purchase more than $300,000.00 in new Packages in any consecutive 3 month period, measured on the last day of a given month.

The execution of the Operating Agreement will also be subject to satisfaction of the conditions precedent deemed appropriate by OHP for transactions of this type generally and for this transaction in particular, including, but not limited to, the following:

- OHP shall have received from PurchaseCo all fees required to be paid and all expenses for which invoices have been presented.

- All governmental and third party approvals necessary in connection with the transaction(s) contemplated hereby and the continuing operations of PurchaseCo, Coast and its subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

- OHP shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates, incumbency certificates, organizational documents, consents, and financing statements or similar filings, all in form and substance acceptable to OHP and its counsel.

- The organizational, capital structure, debt instruments, material accounts and governing documents of Coast and PurchaseCo and their affiliates shall be acceptable to OHP.

The date on which the PurchaseCo Parties execute the Operating Agreement shall be referred to as the "Closing Date."

**PURCHASECO OPERATIONS:**

PurchaseCo will purchase at cost (no mark-up), from lead generating and marketing companies affiliated with Coast ("Affiliates"), cash flow streams that represent the Affiliate's interest in customer payments for debt validation services ("Files"). All Files purchased within a calendar month will be

CONFIDENTIAL

OHPLPG00073178

Nonbinding Term Sheet

collectively called a "Package." Files will be funded from the following capital sources of PurchaseCo, in order of availability:

1) Available cash on hand at PurchaseCo (retaining a minimum Cash (as hereinafter defined) balance of $25,000.00 at all times);

2) Funding Capital, up to the Commitment amount (one draw per month maximum); and

3) Equity infusion from the PurchaseCo Parties in proportion to the Ownership Interests.

Coast will manage the day-to-day operations of PurchaseCo and will administer all Package collections and management of the Files, with the help of a fund administrator (to be hired by PurchaseCo if so requested by OHP). Collections and management will operate substantially similar to the collections and management of current Packages of Files sold to third parties and as detailed in that certain B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020 (Exhibit A), including, but not limited to, the monthly maintenance fee and refund clawback mechanics. At any time, OHP may request that PurchaseCo and Coast engage a backup servicer to onboard in preparation for one day taking over PurchaseCo's servicing and collections should, in OHP's determination, Coast not be able to fulfill such duties. Any commission income due or received by any of Coast, Coast's principals, or its affiliates, related to the purchase of Files or Packages funded by PurchaseCo, shall be contributed to PurchaseCo and deemed income of PurchaseCo and not part of Coast's equity contributions to PurchaseCo. Should Coast or its affiliates ever create an Affiliate or any other similar entity or joint venture (such business to be determined to be an Affiliate or similar business in OHP's reasonable discretion) that is owned or managed, directly or indirectly, by Coast or its principals or affiliates, PurchaseCo shall own a no-cost ownership interest in such Affiliate amounting to 30% and shall have no capital contribution requirements thereto nor any share of liabilities therefrom.

Each of OHP and Coast will appoint a manager to represent its interests at PurchaseCo. Authorization from both Managers representing the PurchaseCo Parties shall be required for certain business operations including, but not limited to, bank outflows (dual authorization required for any disbursements), debt drawdowns, debt prepayments, equity distributions, any raises of debt or equity or issuance/purchase of securities, annual budgeting, tax matters, any acquisition or sale of assets (except in the normal course), initiation or responses to any litigation, and other major activities deemed as such by OHP in its reasonable discretion (collectively "Major Decisions"). The PurchaseCo Parties hereby agree that the exclusive capital provider to PurchaseCo shall be OHP and its assigns, Coast, and Coast's principals.

**RIGHT OF FIRST REFUSAL:**

For so long as PurchaseCo has not been wound down, PurchaseCo will have a right of first offer for any and all Files related to a Coast customer or that of a Coast Affiliate. Should PurchaseCo decline to fund payments associated with a specific File, then the File may be offered to unaffiliated third-party investors. At no point in time can Coast, its subsidiaries, or its affiliates, other than PurchaseCo, be offered a File or cash flows therefrom, except as noted in the Conditions Precedent section above.

**DISTRIBUTIONS:**

At such time as a distribution is made by PurchaseCo to the PurchaseCo Parties, the "waterfall" would work as follows:

3    CONFIDENTIAL

OHPLPG00073179

Nonbinding Term Sheet

1. First, to OHP until such time as OHP has received a return of all Funding Capital contributed to PurchaseCo;
2. Next, to OHP until such time as OHP has received a return of its Equity Investment in PurchaseCo;
3. Next, to Coast until Coast has received a return of all of its Equity Investment in PurchaseCo; and
4. Thereafter, to the PurchaseCo Parties pro rata according to Ownership Interests.

**SECURITY:**

PurchaseCo will be granted a second priority lien on the office building to be purchased by Coast and any other physical property thereafter purchased by Coast. If at any time a first lien on such property is repaid in full and terminated, PurchaseCo shall have a first priority lien.

**CONDITIONS PRECEDENT TO EACH ADVANCE OF FUNDING CAPITAL:**

In advance of each funding request, Coast agrees to furnish to OHP, with adequate notice, a report, in a form to be agreed upon by the PurchaseCo Parties, which includes but is not limited to historical and projected performance statistics of Files purchased, organized by Affiliate. Funding of each Funding Capital advance request is subject to OHP's receipt of and approval of such report, such approval not to be unreasonably withheld. Any nonresponse within a specified period of time by OHP is deemed to be an approval of such report.

The making of each monthly contribution of Funding Capital shall further be conditioned upon (a) the accuracy of all representations and warranties in the Operating Agreement (including, without limitation, the material adverse change and litigation representations); (b) there being no breach of any covenants in the Operating Agreement nor any Events of Default (as further defined below) in existence at the time of, or after giving effect to the making of, such contributions of Funding Capital; (c) there being no material adverse change in PurchaseCo's or Coast's business in existence at the time of, or after giving effect to the making of, such Funding Capital advance; and (d) after giving effect to the contribution of Funding Capital, the total outstanding balance of the Funding Capital to PurchaseCo shall not exceed the lesser of the Commitment or the Funding Base then in effect.

**FUNDING CAPITAL COVENANTS:**

The financial covenants under the Operating Agreement governing the Funding Capital shall be as follows:

• PurchaseCo shall not permit the Cancellation Rate (as hereinafter defined) of any monthly Package, or across all owned Files, to be greater than 25%, tested at the end of each calendar month; and

• PurchaseCo's Cash balance shall at all times be at least $25,000.00.

"Cancellation Rate" means, as of any date of determination thereof, an amount, expressed as a percentage, equal to (a) the total dollar amount of undiscounted expected future cash flows from Files cancelled, written off, or greater than 60 days overdue, divided by (b) the total dollar amount of undiscounted received and expected future cash flows from all Files.

"Cash" shall mean cash or cash equivalents of a person, (a) that are not, and are not required to be, designated as "restricted" on the financial statements of such person, (b) that are not contractually required, and have not been contractually committed by such person, to be used for a specific purpose, (c) that are not subject to (i) any provision of law, statute, rule or regulation, (ii) any provision of the organizational documents of such person, or (iii) any order of any

CONFIDENTIAL

OHPLPG00073180

Nonbinding Term Sheet

governmental authority, (d) in which no person has a lien, and (e) that are held in a deposit account or securities account, as applicable, in which OHP has direct access.

**REPRESENTATIONS AND WARRANTIES:**

The Operating Agreement shall contain representations and warranties customary for transactions of this type and other terms deemed appropriate by OHP, including with respect to licenses, permits and compliance with law.

**AFFIRMATIVE COVENANTS:**

The affirmative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, the following: delivery of monthly, quarterly and annual financial statements of Coast and PurchaseCo; annual audits with unqualified opinions of PurchaseCo and Coast; monthly compliance certificates and projections and monthly Funding Base certificates and other information requested by OHP, including materials prepared for and circulated to PurchaseCo's and Coast's boards of directors; delivery of quarterly projections by Coast for OHP's expected advances of Funding Capital; payment of obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations and maintenance of any and all applicable licenses with proper authorities by both Coast and PurchaseCo; accuracy of information; maintenance of property and general liability insurance; maintenance of books and records; right of OHP to inspect property and books and records of Coast and PurchaseCo; notices of defaults, litigation against PurchaseCo and Coast and other material events; continued unrestricted access provided to OHP of all PurchaseCo's bank accounts; use of proceeds of Funding Capital; and all or substantially all of professional time of Coast's senior management devoted to the management of the business of Coast and PurchaseCo.

**NEGATIVE COVENANTS:**

The negative covenants applicable to PurchaseCo and its subsidiaries shall include, without limitation, limitations on the following (subject to exceptions, as appropriate, to be negotiated and including the specific exceptions set forth herein):

- indebtedness (including guarantee obligations);
- liens;
- fundamental changes (including mergers, consolidations, liquidations, dissolutions, and divisions; changes in fiscal year and changes in line of business; transfers of interests; issuances of securities);
- investments;
- dispositions of assets outside the normal course;
- payment of restricted payments (including dividends and other payments in respect of equity interests);
- negative pledge clauses on the PurchaseCo Parties;
- Eligible Receivables will not be funded by any person or entity other than OHP or PurchaseCo using its own internal funds;
- Coast, Coast's senior management and principals, and any of their respective affiliates will not participate in any business related to, premised on, or competitive with purchasing debt validation receivables outside of Coast's current business arrangement and its participation with PurchaseCo, nor will Coast or its principals engage in any business brokering, trading or selling debt validation receivables outside of PurchaseCo; or

5                                    CONFIDENTIAL

OHPLPG00073181

Nonbinding Term Sheet

- amendment of material documents.

**EVENTS OF DEFAULT:** Following an Event of Default (as hereinafter defined), the Commitment shall be reduced to $0, and OHP shall take sole control over PurchaseCo and cause all assets of PurchaseCo, including existing cash and any cash from receivables owned by PurchaseCo, to be distributed directly to OHP until OHP's Funding Capital and Equity Investment are fully repaid. Following full repayment of OHP's Funding Capital and Equity Investment, PurchaseCo's operations and ownership shall revert as if such Event of Default had not occurred. An "Event of Default" includes, without limitation: nonpayment of fees or other amounts when due under any purchase agreement or the Operating Agreement; representations and warranties set forth in the Operating Agreement becoming incorrect in any material respect; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); occurrence of a default (whether or not resulting in acceleration) under any agreement governing indebtedness, in excess of an amount to be agreed upon, of PurchaseCo; bankruptcy events of PurchaseCo, Coast or Coast's principals; guilty or nolo contendere pleas by PurchaseCo, Coast or any of Coast's principals to any offense; conviction of a criminal offense or civil judgment in excess of $50,000 of PurchaseCo, Coast or any of Coast's principals; certain ERISA events; material adverse changes that, in OHP's discretion, negatively impact PurchaseCo's or Coast's business prospects; a change of control at either PurchaseCo or Coast; and a meaningful (in OHP's discretion) increase in the volume of complaints filed against PurchaseCo, Coast, or Coast's Affiliates on files held by PurchaseCo, to the BBB, EEOC or other national consumer service.

**EXPENSES AND INDEMNIFICATION:** PurchaseCo shall pay (a) all expenses of OHP associated with the preparation, execution, delivery and administration of the Operating Agreement, prior Package and File purchase agreements, and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) whether or not the transaction closes, (b) all expenses of OHP (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Operating Agreement and all ongoing business expenses of OHP (including but not limited to administration, tax, legal and accounting), (c) fees and expenses associated with other advisors and professionals engaged by OHP in connection with the PurchaseCo Operating Agreement, and (d) other related expenses incurred by OHP during the due diligence process.

The Operating Agreement will contain standard indemnification and exculpation language related to the members of PurchaseCo.

**GOVERNING LAW:** This term sheet is, and the Operating Agreement will be, governed by the internal laws of the State of Delaware.

**WAIVER OF JURY TRIAL:** In the Operating Agreement, each party will agree to a waiver of jury trial substantially similar in form and substance to the following:

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE,

CONFIDENTIAL

OHPLPG00073182

Nonbinding Term Sheet

                    AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**VENUE:**                    Travis County, Texas.

CONFIDENTIAL

OHPLPG00073183

Nonbinding Term Sheet

       Each of the parties hereby approves and adopts this Term Sheet as of _____, 2020.

**B.A.T. Inc.**


By: _____
Name: _____
Title: _____

**Coast Processing Principals, individually**


By: _____
Name:  Brian Reale



By: _____
Name:  Asante Bayrooti



By: _____
Name:  Mario Azevedo

**Old Hickory Partners – Coast, LP**

By:      Old Hickory GP, LLC,
         its general partner



By: _____
Name:  Adam C. Blum
Title:  Manager

CONFIDENTIAL

OHPLPG00073184

Nonbinding Term Sheet

Exhibit A:

B.A.T. Inc. dba Coast Processing - Affiliate Agreement with ACB Holdings, LP, dated September 29, 2020

CONFIDENTIAL

OHPLPG00073185

**B.A.T. Inc. dba Coast Processing - Affiliate Agreement**

THIS AGREEMENT (the "Agreement") is made and effective as of this 29th of September, 2020 by and between B.A.T. Inc. dba Coast Processing ("BAT"), and **ACB Holdings, LP** ( "Purchaser"), and together with BAT's affiliated marketing team(s) (the "Affiliate").

RECITALS:

BAT is in the business of providing administrative support services for law firms providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a duly licensed law firm The Litigation Practice Group PC ("LPG"). Among the services offered by BAT through LPG are the following:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Protection from harassing collection practices, including but not limited to the initiation of actions under the Telephone Consumer Protection Act and Fair Debt Collection Practices Act; and
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee. BAT reviews all client files prior to the execution of the client's legal services agreement with LPG, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG through its agent, BAT. Affiliate, acting in accordance with direction from BAT, shall obtain the names of prospective consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides. For consumers interested in utilizing BAT's services (a "Consumer"), Affiliate will assist BAT in having Consumers execute an approved legal services agreement with [LPG] to which BAT provides administrative support services. Following execution of an approved legal services agreement, Consumers will become clients of [LPG], and LPG will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.

Pursuant to a separate agreement, BAT has acquired from Affiliate all right, title and interest to the payments owing to Affiliate from the client files of the Consumers listed on Addendum A (the "Client Files"). Purchaser desires to purchase from BAT, and BAT desires to sell to Purchaser, the Consumer payments associated with the Client Files. The parties hereto desire to enter into this Agreement to provide for the acquisition of the all right, title and interest to the payments owing to Affiliate (the "Payments") resulting from the Consumers under the Client Files.

1

OHPLPG00073186

BAT, Purchaser and Affiliate hereby agree to the following:

1.  Subject to the terms of this Agreement, each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.  Affiliate shall comply with state and federal laws in performing (a) its operations associated with the transactions contemplated herein and (b) its obligations under this agreement and any other agreement associated herewith, including communicating with Consumers regarding BAT or any of its programs.

3.  BAT shall comply with state and federal laws in performing (a) its operations associated with the transactions contemplated herein, (b) its obligations under this Agreement, and (c) the legal services agreement entered into between BAT and the Consumers referred by Affiliate.

4.  If requested by BAT, Affiliate shall provide a copy of all marketing materials to BAT upon receiving a request from BAT.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.  Affiliate agrees to keep any and all documents or communications between itself and BAT/Purchaser confidential pursuant to the provisions set forth below.

6.  <u>Acquisition.</u>

    a.  BAT hereby grants, assigns, sells, conveys, transfers and delivers to Purchaser and Purchaser hereby accepts, assumes and receives from BAT, all of BAT's right, title and interest to the Payments (which represents 65% of the payments received by BAT for the Client Files) in exchange for PURCHASER remitting to BAT a fee of $437,750.00 (the "Purchase Price").

    b.  Following the execution of this Agreement and the payment of the Purchase Price, BAT shall pay 65% of the difference resulting from (1) each Payment per Client File for each Consumer listed on Addendum A to this Agreement, which represents all of Affiliate's right, title and interest to the Payments, less (2) the monthly maintenance fee of $91.38, which BAT shall retain to cover administrative costs for each Client File. BAT acknowledges Affiliate has placed the Consumers with BAT.  Payment of 65% of each Client File shall be made by BAT direct to PURCHASER, and no portion of the per Client File payment shall be made to Affiliate, upon receipt of such funds by BAT.

    c.  If BAT is required to refund payment for services to any Consumer, then Purchaser shall be responsible for returning the entirety of its fees collected on such Client File to BAT (in such percentage as is set forth herein).  BAT has exclusive discretion to grant or deny a requested refund or cancellation, subject to the terms of this Agreement.  BAT shall be entitled to offset any future payments to Purchaser in order to recover a refund awarded by BAT.

2

OHPLPG00073187

    d.  The amounts paid from the Consumers for each Client File shall be receivables of PURCHASER, and Purchaser shall have an undivided interest in the whole of any receivable from BAT, such that it shall have a legal claim to such receivable.

7.  Each of BAT, Affiliate and Purchaser have all requisite power and authority to execute and deliver this Agreement and the other documents contemplated hereby (the "Transaction Documents") to which it is a party, to consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party. All requisite actions on the part of BAT, Affiliate and Purchaser and their officers, managers and members necessary for the authorization, execution and delivery of this Agreement and the other Transaction Documents to which they are a party, and the performance of all obligations of such party hereunder and thereunder, has been taken. This Agreement and the other Transaction Documents to which each of BAT and Affiliate is a party have been duly and validly executed and delivered and constitute, assuming this Agreement and the other Transaction Documents to BAT and Affiliate are a party have been duly authorized, executed and delivered by the other parties thereto, valid and legally binding obligations of each of BAT and Affiliate, enforceable against each of them in accordance with their respective terms, subject to applicable bankruptcy or other similar Laws affecting the rights and remedies of creditors generally as well as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). BAT represents and warrants to Purchaser that BAT has good and marketable title to, all Client Files and Affiliate has no right to receive any payment with respect to such Client Files. Each Consumer represented by the Client Files has made at least one of their required payments to BAT.

8.  Each of BAT and Affiliate are in compliance in all material respects with all any federal, state, local or foreign law (including common law), statute, code, ordinance, rule, regulation or other requirement ("Law") applicable to its business or operations. Neither of BAT or Affiliate have received any written or other notice or been charged with the violation of any Laws. To the knowledge of BAT and Affiliate, neither is under investigation with respect to the violation of any Laws and, to the knowledge of BAT and Affiliate, there are no facts or circumstances which could form the basis for any such violation. BAT and Affiliate currently have all material approvals, authorizations, consents, licenses, permits or certificates which are required for the operation of the business as presently conducted ("Permits"). Neither BAT and Affiliate (i) are in default or violation (and no event has occurred which, with notice or lapse of time or both, would constitute a default or violation) of any term, condition or provision of the certificate of organization of the relevant party, and (ii) are in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit, to which the business is subject or by which its properties or assets are bound, and to the knowledge of the BAT and Affiliate, there are no facts or circumstances which could form the basis for any such default or violation.

9.  No fee (other than the amount set forth Paragraph 6) shall be due from PURCHASER to either Affiliate or BAT, except the refund deduction set forth in Paragraph 10. PURCHASER shall be entitled to all payments due to Affiliate from the Client Files as described under Paragraph 6, without limitation. Neither BAT nor Affiliate may modify this Agreement without the express written consent of PURCHASER, which consent may be withheld for any reason without limitation.

OHPLPG00073188

10. BAT shall bear all expenses related to the services it offers to Consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph. No expense shall be borne by PURCHASER. BAT reserves all rights with regard to rejection or cancellation of a Consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, subject to the applicable state bar rules for such representation and the consent of Purchaser. PURCHASER shall be responsible for its pro rata share of refunds issued to a client as the result of a cancellation, which refund shall be borne in proportion to PURCHASER's share of fees as set forth in Paragraph 6. Notwithstanding anything to the contrary in this Agreement, such refund shall be deducted from future remittance by PURCHASER, except that if all payments to PURCHASER have been complete, any refund issued by BAT to client shall be borne exclusively by BAT. To the extent a refund or cancellation is granted to a Consumer due to a breach of a representation, warranty or covenant set forth in this Agreement, the Purchase Price shall be reduced by the amount of the Purchase Price attributable to the refunded or cancelled Client File, as calculated by taking the total value of the relevant Client File divided by the aggregate value of all Client Files and multiplying such number by the Purchase Price.

11. BAT and Affiliate shall indemnify, defend and hold harmless the Purchaser and its successors and assigns, heirs, beneficiaries, legal and other representatives and affiliates, and each of their respective partners, members, shareholders, managers, directors, officers, employees and agents (collectively, the "Purchaser Group") from and against all claims, actions or causes of action, assessments, demands, losses, damages, judgments, fines, settlements, liabilities, costs and expenses, including interest, penalties and reasonable attorneys', experts' and accounting fees and expenses of any nature whatsoever (collectively, "Damages"), asserted against, suffered by, imposed upon or incurred by any member of the Purchaser Group to the extent caused by (a) BAT's, Affiliate's or LPG's actions or omissions in their business operations, or (b) a breach of any covenant, agreement, representation or warranty of BAT and Affiliate contained in this Agreement. The indemnity provided for in this <u>Section 11</u> is not limited to third party claims against members of the Purchaser Group. This Section 11 shall survive the termination of this Agreement.

12. Notwithstanding anything to the contrary in this Agreement, prior to March 31, 2020, BAT shall not, and shall not allow any of its affiliates to, offer any client files or similar revenue generating opportunities to any other Person (as defined under applicable law) other than to Purchaser, except for any existing relationship for the acquisition of customer files; *provided, however,* if Purchaser elects to not participate in such opportunity or fails to respond to BAT or its applicable affiliate within ten (10) business days, BAT or its applicable affiliate will be permitted to enter into a transaction with a third-party purchaser. Any notice of a prospective business opportunity shall be delivered in writing by e-mail (read receipt requested) to <u>adamblum@aol.com</u> and <u>kevin.yu93@gmail.com.</u>

13. This Agreement shall continue in full force and effect until the conclusion of the payment term of the clients set forth in attached addenda. Those respective client lists are attached hereto as Addendum A, Addendum B, and Addendum C, and each represents a separate batch of clients delivered from separate marketing affiliates. The anticipated return on this investment is 22% to 27%, but no return is guaranteed. The anticipated return is based on the prior performance of other clients, but the performance of the clients contained in the packages attached as Addendum A, Addendum B, and

4

Addendum C is unknown, and no representation is made as to the likely performance of such clients. The parties agree that the use of the phrase "payment term" shall mean the total of all payments due from any client listed in Addendum A to BAT or Affiliate without limitation, and without regard to whether a modification of the agreement between such client and BAT shall have taken place. Upon the conclusion of all payments from all clients listed in Addendum A to BAT, and BAT's payment in turn to PURCHASER, this Agreement shall cease except that any term contemplated to extend beyond the completion of such term shall remain in full force and effect.

14.    Upon termination of this Agreement for any reason whatsoever, BAT, Purchaser and Affiliate will refrain, and will instruct their affiliates, officers, directors, employees, contractors and agents to refrain, from making any disparaging or negative comment, remark, statement, or implication, whether written or oral, about any party to this Agreement.

15. The confidential information of BAT, Purchaser or Affiliate shall include information regarding contracts, customer or client lists or information, employees, directors, officers, investors, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, this Agreement, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons. None of BAT, Purchaser or Affiliate may disclose the confidential information of the other, the name of the other, or the existence of this Agreement without the express written consent of the applicable party.    The disclosure of information in connection with a judicial or administrative proceeding shall not constitute a violation of this term. The parties hereto agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure, to the extent legally and practically permissible.    The parties hereto agree to work together in good faith to remediate any disclosure of confidential information.  A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

16. Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to Consumer, including credit repair or debt relief programs.  The Affiliate is not restricted from marketing on behalf of debt settlement, debt consolidation, credit repair, or debt relief entities, including but not limited to other law firms.  BAT and Affiliate hereby agree that any and all prior agreements entered into by BAT and Affiliate or any law firm to which BAT provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of BAT's administrative support services.

17. This Agreement shall be governed by the laws of the State of California, and the Courts of the State of California, County of Orange, shall have exclusive subject matter jurisdiction over this Agreement. All parties hereto to this Agreement consent to the personal jurisdiction of the Superior Court of California, County of Orange, over such party.

OHPLPG00073190

18. Affiliate agrees not to use the name BAT in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless BAT provides prior written consent to such specific use.

19. Any fees incurred by BAT in connection with a Consumer's Non-Sufficient Funds ("NSF") fee shall be borne mutually by both BAT and Purchaser if and only if the Consumer cancels the program after such NSF. To the extent the Consumer cancels the program after such NSF, Purchaser shall bear that portion of the NSF fee commensurate with its share of the per file fee set forth in Paragraph 6, above. This amount shall be deducted from the fees remitted to Purchaser in the month in which the client having an outstanding NSF charge cancels the program without remitting such NSF fee.

20. This Agreement may be assigned or transferred without the prior written consent of the other by PURCHASER. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns.

21. In the event of a breach, the party who prevails in any court proceeding shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

22. This Agreement contains the entire Agreement between the Parties hereto, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by BAT, Purchaser and Affiliate.

[signature page follows on the next page]

6

OHPLPG00073191

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, all as of the day and year first above written.

**B.A.T. Inc.**

By: Brian Reale

Title: Chief Executive Officer

ACB Holdings, LP

By: _____

Name:   Adam C. Blum

Title:    Manager

7

OHPLPG00073192

**Electronic Funds Transfer Authorization**

This Electronic Funds Transfer (EFT) authorization is for use in connection with the foregoing Agreement, and permits BAT to transfer any and all amounts due to ("PURCHASER") under the foregoing Agreement by EFT. By signing below, PURCHASER hereby authorizes BAT to initiate EFT transfers at its discretion, with all fees and costs incurred by PURCHASER in connection with such transfer to be borne by PURCHASER, while all fees and costs incurred by BAT in connection with such transfer to be borne by BAT.

Account Holder Signature: _____  Date: _01-OCT-2020____

By:    ADAM BLUM
        VICE PRESIDENT OF ACB HOLDINGS
        MANAGEMENT, LLC, ITS GENERAL
Title:    PARTNER

Account Owner Name:  ACB HOLDINGS LP

Social Security Number / FEIN Number associated with account listed below:

██████████

Address:
        777 MAIN ST STE 550
        FORT WORTH, TX 76102
           817-710-7073
City:   State:  Zip: Tel:

Bank Name:     BANK OF TEXAS

Routing Number:    ██████████████

Account Number:   CHECKING

Account type :

8

# ADDENDUM A

OHPLPG00073194

| Full Name | Company | Assigned To | Enrolled Date | Monthly Payment | First Payment Date | Debt Enrolled | Fee 1 | State | Program Length (Mos) | Pay Freq | Total Program Cost | Client Status | Total Payment Cleared | # Pmts Cleared |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Benefit 1st Financial | | Jul 31, 2020 | $ 291.89 | Aug 04, 2020 | $ 11,546.00 | 49% | TN | 26.00 | Monthly | $ 7,523.04 | Active File | $ 523.38 | 2 |
| | Benefit 1st Financial | | Jul 28, 2020 | $ 752.28 | Aug 04, 2020 | $ 1,798.00 | 49% | HI | 6.00 | Monthly | $ 1,251.00 | Active File | $ 600.52 | 2 |
| | Benefit 1st Financial | | Jul 24, 2020 | $ 378.24 | Aug 12, 2020 | $ 25,296.50 | 28% | FL | 35.00 | Monthly | $ 9,944.84 | Active File | $ 353.48 | 2 |
| | Benefit 1st Financial | | Jul 20, 2020 | $ 291.00 | Jul 23, 2020 | $ 7,531.00 | 49% | CA | 29.00 | Monthly | $ 6,340.00 | Active File | $ 524.00 | 2 |
| | Benefit 1st Financial | | Jul 17, 2020 | $ 398.94 | Aug 06, 2020 | $ 14,688.00 | 36% | PA | 32.00 | Monthly | $ 8,029.00 | Active File | $ 601.88 | 2 |
| | Benefit 1st Financial | | Jul 17, 2020 | $ 546.14 | Jul 28, 2020 | $ 41,936.00 | 48% | ME | 39.00 | Monthly | $ 19,749.00 | Active File | $ 1,096.46 | 2 |
| | Benefit 1st Financial | | Jul 06, 2020 | $ 518.99 | Aug 10, 2020 | $ 38,093.00 | 40% | OH | 38.00 | Monthly | $ 18,570.68 | Active File | $ 1,026.38 | 2 |
| | Benefit 1st Financial | | Jul 03, 2020 | $ 487.88 | Aug 03, 2020 | $ 24,084.31 | 40% | NV | 36.00 | Monthly | $ 13,235.43 | Active File | $ 736.00 | 2 |
| | Benefit 1st Financial | | Jul 02, 2020 | $ 251.62 | Jul 22, 2020 | $ 13,196.00 | 39% | KY | 39.00 | Monthly | $ 7,303.92 | Active File | $ 503.64 | 2 |
| | Benefit 1st Financial | | Jun 17, 2020 | $ 254.27 | Jul 26, 2020 | $ 14,193.00 | 35% | PA | 32.00 | Monthly | $ 8,136.71 | Active File | $ 601.64 | 2 |
| | Benefit 1st Financial | | Aug 28, 2020 | $ 290.95 | Sep 14, 2020 | $ 6,335.21 | 35% | PA | 11.00 | Monthly | $ 3,272.43 | Active File | $ 202.00 | 1 |
| | Benefit 1st Financial | | Aug 25, 2020 | $ 290.43 | Sep 00, 2020 | $ 7,147.00 | 49% | MA | 17.00 | Monthly | $ 4,418.38 | Active File | $ 219.43 | 1 |
| | Benefit 1st Financial | | Aug 05, 2020 | $ 1,904.29 | Aug 28, 2020 | $ 154,114.00 | 35% | MD | 58.00 | Monthly | $ 54,447.50 | Active File | $ 1,604.00 | 1 |
| | Benefit 1st Financial | | Aug 11, 2020 | $ 389.95 | Sep 10, 2020 | $ 40,223.00 | 27% | MA | 42.00 | Monthly | $ 16,498.17 | Active File | $ 948.99 | 4 |
| | Benefit 1st Financial | | Aug 10, 2020 | $ 259.19 | Sep 09, 2020 | $ 17,198.00 | 35% | PA | 26.00 | Monthly | $ 9,891.96 | Active File | $ 100.00 | 1 |
| | Benefit 1st Financial | | Aug 06, 2020 | $ 266.89 | Aug 17, 2020 | $ 5,444.00 | 40% | WV | 13.00 | Monthly | $ 3,386.94 | Active File | $ 256.89 | 1 |
| | Benefit 1st Financial | | Aug 03, 2020 | $ 292.29 | Aug 31, 2020 | $ 38,574.00 | 15% | OK | 44.00 | Monthly | $ 14,829.14 | Active File | $ 292.29 | 1 |
| | Benefit 1st Financial | | Jul 31, 2020 | $ 504.95 | Aug 18, 2020 | $ 13,347.00 | 40% | CA | 25.00 | Monthly | $ 7,823.30 | Active File | $ 304.93 | 1 |
| | Benefit 1st Financial | | Jul 29, 2020 | $ 1,714.50 | Aug 25, 2020 | $ 119,080.00 | 40% | NH | 54.00 | Monthly | $ 67,325.75 | Active File | $ 1,314.00 | 1 |
| | Benefit 1st Financial | | Jul 29, 2020 | $ 282.74 | Aug 31, 2020 | $ 10,218.00 | 39% | GA | 18.00 | Monthly | $ 5,358.22 | Active File | $ 282.74 | 1 |
| | Benefit 1st Financial | | Jul 27, 2020 | $ 269.99 | Aug 14, 2020 | $ 12,098.00 | 30% | OH | 24.00 | Monthly | $ 5,189.22 | Active File | $ 269.71 | 1 |
| | Benefit 1st Financial | | Jul 13, 2020 | $ 715.13 | Aug 28, 2020 | $ 39,409.00 | 21% | CA | 40.00 | Monthly | $ 26,605.56 | Active File | $ 715.13 | 1 |

**Total Debt  $ 702,085.02**

OHPLPG00073195

# ADDENDUM B

OHPLPG00073196

| Company | Assigned To | Enrolled Date | Monthly Payment | First Payment Date | Debt Enrolled | Fee % | State | Program Length (mons) | Pay Freq | Total Program Cost | Client Status | Total Payments Cleared | # Drafts Cleared |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Debt Resolution Direct | Aug 21, 2020 | $ | 903.11 | Dec 15, 2020 | $ | 22,643.02 | 40% | TN | 22.00 | Monthly | $ | 11,657.38 | Active File | $ | 903.11 | 1 |
| Debt Resolution Direct | Aug 20, 2020 | $ | 903.12 | Aug 23, 2020 | $ | 37,087.00 | 49% | TX | 20.00 | Monthly | $ | 18,112.68 | Active File | $ | 903.12 | 1 |
| Debt Resolution Direct | Aug 20, 2020 | $ | 704.23 | Sep 09, 2020 | $ | 28,042.99 | 30% | MD | 24.00 | Monthly | $ | 10,962.28 | Active File | $ | 704.23 | 1 |
| Debt Resolution Direct | Aug 20, 2020 | $ | 708.77 | Sep 15, 2020 | $ | 65,509.00 | 42% | TX | 20.00 | Monthly | $ | 25,515.01 | Active File | $ | 708.77 | 1 |
| Debt Resolution Direct | Aug 20, 2020 | $ | 656.48 | Sep 15, 2020 | $ | 17,712.03 | 40% | AL | 12.00 | Monthly | $ | 6,101.26 | Active File | $ | 656.48 | 1 |
| Debt Resolution Direct | Aug 20, 2020 | $ | 909.60 | Sep 15, 2020 | $ | 21,447.00 | 42% | AZ | 36.00 | Monthly | $ | 11,868.42 | Active File | $ | 909.60 | 1 |
| Debt Resolution Direct | Aug 19, 2020 | $ | 419.34 | Sep 08, 2020 | $ | 25,816.00 | 37% | CO | 38.00 | Monthly | $ | 13,508.08 | Active File | $ | 419.34 | 1 |
| Debt Resolution Direct | Aug 19, 2020 | $ | 419.65 | Dec 01, 2020 | $ | 29,533.00 | 40% | DE | 36.00 | Monthly | $ | 15,149.08 | Active File | $ | 419.65 | 1 |
| Debt Resolution Direct | Aug 19, 2020 | $ | 503.80 | Sep 16, 2020 | $ | 14,945.00 | 30% | KY | 24.00 | Monthly | $ | 6,014.42 | Active File | $ | 283.83 | 1 |
| Debt Resolution Direct | Aug 18, 2020 | $ | 963.79 | Sep 09, 2020 | $ | 79,911.00 | 44% | IL | 36.00 | Monthly | $ | 34,884.48 | Active File | $ | 963.79 | 1 |
| Debt Resolution Direct | Aug 18, 2020 | $ | 1,005.71 | Sep 16, 2020 | $ | 88,492.00 | 47% | TN | 38.00 | Monthly | $ | 29,043.03 | Active File | $ | 1,005.71 | 1 |
| Debt Resolution Direct | Aug 18, 2020 | $ | 638.09 | Sep 18, 2020 | $ | 37,913.00 | 40% | FL | 36.00 | Monthly | $ | 18,318.68 | Active File | $ | 638.09 | 1 |
| Debt Resolution Direct | Aug 18, 2020 | $ | 311.80 | Aug 25, 2020 | $ | 12,228.00 | 40% | WA | 14.00 | Monthly | $ | 7,484.74 | Active File | $ | 311.80 | 1 |
| Debt Resolution Direct | Aug 17, 2020 | $ | 416.38 | Sep 09, 2020 | $ | 24,209.00 | 40% | CA | 36.00 | Monthly | $ | 14,686.68 | Active File | $ | 416.58 | 1 |
| Debt Resolution Direct | Aug 17, 2020 | $ | 626.80 | Sep 08, 2020 | $ | 46,348.00 | 40% | IL | 36.00 | Monthly | $ | 27,036.68 | Active File | $ | 626.46 | 1 |
| Debt Resolution Direct | Aug 17, 2020 | $ | 391.50 | Sep 01, 2020 | $ | 16,547.00 | 40% | NY | 36.00 | Monthly | $ | 10,690.43 | Active File | $ | 391.50 | 1 |
| Debt Resolution Direct | Aug 17, 2020 | $ | 383.44 | Sep 09, 2020 | $ | 33,043.00 | 39% | MM | 36.00 | Monthly | $ | 13,503.68 | Active File | $ | 383.44 | 1 |
| Debt Resolution Direct | Aug 17, 2020 | $ | 482.87 | Sep 01, 2020 | $ | 33,243.00 | 40% | IL | 38.00 | Monthly | $ | 17,386.98 | Active File | $ | 482.87 | 1 |
| Debt Resolution Direct | Aug 15, 2020 | $ | 386.06 | Sep 16, 2020 | $ | 28,832.00 | 40% | CA | 36.00 | Monthly | $ | 13,936.84 | Active File | $ | 386.06 | 1 |
| Debt Resolution Direct | Aug 14, 2020 | $ | 648.82 | Sep 11, 2020 | $ | 37,693.00 | 30% | IL | 36.00 | Monthly | $ | 19,219.64 | Active File | $ | 648.82 | 1 |
| Debt Resolution Direct | Aug 14, 2020 | $ | 609.65 | Sep 09, 2020 | $ | 48,165.00 | 36% | KS | 24.00 | Monthly | $ | 20,547.43 | Active File | $ | 609.65 | 1 |
| Debt Resolution Direct | Aug 13, 2020 | $ | 312.84 | Aug 18, 2020 | $ | 19,904.00 | 40% | AZ | 36.00 | Monthly | $ | 11,223.28 | Active File | $ | 312.84 | 1 |
| Debt Resolution Direct | Aug 13, 2020 | $ | 700.48 | Aug 28, 2020 | $ | 54,817.00 | 40% | WA | 36.00 | Monthly | $ | 25,218.48 | Active File | $ | 700.48 | 1 |
| Debt Resolution Direct | Aug 13, 2020 | $ | 818.00 | Sep 01, 2020 | $ | 47,429.00 | 40% | CO | 36.00 | Monthly | $ | 22,255.08 | Active File | $ | 818.00 | 1 |
| Debt Resolution Direct | Aug 13, 2020 | $ | 639.96 | Aug 20, 2020 | $ | 32,945.00 | 40% | IL | 20.00 | Monthly | $ | 15,036.68 | Active File | $ | 638.96 | 1 |
| Debt Resolution Direct | Aug 12, 2020 | $ | 406.10 | Sep 16, 2020 | $ | 28,935.00 | 40% | CA | 36.00 | Monthly | $ | 14,727.68 | Active File | $ | 406.10 | 1 |
| Debt Resolution Direct | Aug 12, 2020 | $ | 706.01 | Aug 25, 2020 | $ | 63,897.00 | 49% | WA | 36.00 | Monthly | $ | 28,786.48 | Active File | $ | 706.01 | 1 |
| Debt Resolution Direct | Aug 12, 2020 | $ | 737.87 | Sep 16, 2020 | $ | 58,246.00 | 40% | IL | 36.00 | Monthly | $ | 26,943.25 | Active File | $ | 737.87 | 1 |
| Debt Resolution Direct | Aug 12, 2020 | $ | 517.10 | Sep 11, 2020 | $ | 28,375.00 | 40% | IL | 36.00 | Monthly | $ | 15,616.68 | Active File | $ | 517.10 | 1 |
| Debt Resolution Direct | Aug 11, 2020 | $ | 506.78 | Sep 02, 2020 | $ | 14,575.00 | 40% | CA | 36.00 | Monthly | $ | 8,003.04 | Active File | $ | 506.78 | 1 |
| Debt Resolution Direct | Aug 11, 2020 | $ | 625.14 | Sep 25, 2020 | $ | 44,606.00 | 40% | IL | 36.00 | Monthly | $ | 22,512.08 | Active File | $ | 625.14 | 1 |

| | |
|---|---|
| Total Debt | $2,974,910.49 |

OHPLPG00073198

# ADDENDUM C

OHPLPG00073199

| Full Name | Company | Assigned To | Enrolled Date | Monthly Payment | First Payment Date | Debt Enrolled | Fee % | State | Program Length (Months) | Pay Freq | Total Program Cost | Client Status | Total Payments Cleared | # Drafts Cleared |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Litigation Practice Center | | | | | | | | | | | | | |



Total Debt   $ 1,089,205.99

Message

| | |
|---|---|
| **From**: | Rosell, Andrew [arosell@winstead.com] |
| on behalf of | Rosell, Andrew <arosell@winstead.com> [arosell@winstead.com] |
| **Sent**: | 12/16/2020 12:40:55 AM |
| **To**: | Tony Diab [tony@coastprocessing.com] |
| **CC**: | Kevin Yu [kevin.yu93@gmail.com]; Allen, Ben [ballen@winstead.com]; Adam Blum [AdamBlum@aol.com]; Dyer, Trip [pdyer@winstead.com] |
| **Subject**: | RE: Discussion of entity type and domicile |

Tony,

Thank you.  We have a term sheet started with Kevin and Adam that will be couched in terms of a Delaware LLC.  We're finishing it up now and we'll send it through.

Best,

Andrew

**Andrew J. Rosell,** Shareholder
Winstead PC  |  300 Throckmorton Street, Suite 1700  |  Fort Worth, Texas 76102
817.420.8261 *direct*


**From:** Tony Diab <tony@coastprocessing.com>
**Sent:** Tuesday, December 15, 2020 6:21 PM
**To:** Rosell, Andrew <arosell@winstead.com>
**Cc:** Kevin Yu <kevin.yu93@gmail.com>; Allen, Ben <ballen@winstead.com>; Adam Blum <AdamBlum@aol.com>; Dyer, Trip <pdyer@winstead.com>
**Subject:** Re: Discussion of entity type and domicile

Hi Andrew -

We are ok with a DE corporation, please forward the term sheet for approval and we can then draft the operating agreement.  If you have a draft operating agreement for the new entity please forward for review.

Thanks!

On Tue, Dec 15, 2020 at 1:58 PM Rosell, Andrew <arosell@winstead.com> wrote:

Tony – A Delaware entity that is not located in Delaware does not pay Delaware state tax.  The entity will have annual fees to pay to maintain its status as an entity, but this is true in Nevada also (and every other state).


Our preference is Delaware.  Can you confirm the above with your counsel so you can be comfortable with Delaware and then we can proceed.  I think this is more efficient than a phone call.


Thanks,


Andrew

EXHIBIT 520

OHPLPG00073202

**Andrew J. Rosell,** Shareholder

Winstead PC  |  300 Throckmorton Street, Suite 1700  |  Fort Worth, Texas 76102

817.420.8261 *direct*

**From:** Tony Diab <tony@coastprocessing.com>
**Sent:** Tuesday, December 15, 2020 2:52 PM
**To:** Kevin Yu <kevin.yu93@gmail.com>
**Cc:** Rosell, Andrew <arosell@winstead.com>; Allen, Ben <ballen@winstead.com>; Adam Blum <AdamBlum@aol.com>
**Subject:** Re: Discussion of entity type and domicile

I am free any time after 2:30 pm Pacific today, or after 11:00 am Pacific tomorrow.

620-474-0301

Thanks!

On Tue, Dec 15, 2020 at 12:04 PM Kevin Yu <kevin.yu93@gmail.com> wrote:

Hey Tony,

Sorry for the delayed response, trying to get Winstead's availability as well so we can knock this all out in one go. What times work best for you today and/or tomorrow at this point?

Kevin Yu

kevin.yu93@gmail.com

(512) 888-8897

On Mon, Dec 14, 2020 at 11:34 PM Tony Diab <tony@coastprocessing.com> wrote:

Hi Kevin -

There is no aversion to Delaware.  That jurisdiction is typically sought by entities that are or might someday be traded on an exchange.  For obvious reasons that can never happen with the entity we are creating.  The advantages to DE are otherwise non-existent from my perspective, but I am open to any jurisdiction to be honest.  We are most comfortable with NV where we know the laws and also have no state income tax, but we would consider any jurisdiction in which we could qualify to state income tax avoidance.  I think a phone call makes sense, what is a good time to speak tomorrow?

Thanks!

OHPLPG00073203

On Mon, Dec 14, 2020 at 2:42 PM Kevin Yu <kevin.yu93@gmail.com> wrote:

Hi Tony,

Following up on my text message. Give me a call when you have a chance. Just wanted to see if there was any further context to the venue preferences, and in particular, you could better articulate the preference to avoid Delaware. Again, I'm sure it's our lawyers making sure all of our bases are covered, they just thought it was a bit strange as Delaware has generally been our de facto venue and we haven't previously experienced much pushback.

Thanks,

Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

On Thu, Dec 10, 2020 at 4:28 PM Tony Diab <tony@coastprocessing.com> wrote:

Hi Kevin -

Our preference is a Nevada LLC if we are going the LLC route. In Texas, we would prefer a corporation. We prefer to avoid Delaware.

Thanks!

On Thu, Dec 10, 2020 at 2:00 PM Kevin Yu <kevin.yu93@gmail.com> wrote:

Hey Tony,

Quick update, I believe our counsel is familiarizing themselves with Nevada laws to make sure everyone's interests are equally protected. In the meantime, do I remember correctly that y'all would be open to a Texas LLC as well? Our counsel is definitely more familiar with Texas than Nevada so that'd greatly speed up their due diligence and be our preference if Delaware doesn't work for y'all.

Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

On Tue, Dec 8, 2020 at 12:11 AM Tony Diab <tony@coastprocessing.com> wrote:

Hi Andrew -

C corporations have formal shareholder rights which offer greater protection to the interested parties.  We are happy to proceed with a Nevada LLC based on our familiarity, but in any other state we would want a C corporation to ensure greater protection of Brian and Asante's rights as (majority) shareholders.  Would you be open to a Nevada LLC?  Asante has property in Nevada and spends enough time to qualify as a Nevada resident, and BAT LLC, a Nevada limited liability company, has already been formed.

Thanks!

On Mon, Dec 7, 2020 at 3:25 PM Rosell, Andrew <arosell@winstead.com> wrote:

> Tony,
>
> It might be more efficient for your counsel and you to email the basic rationale for a c-corp.  Given the tax cost associated with c-corp status, the rationale for a c-corp isn't immediately apparent.
>
> Thanks,
>
> Andrew
>
>
>
> **Andrew J. Rosell,** Shareholder
>
> Winstead PC  |  300 Throckmorton Street, Suite 1700  |  Fort Worth, Texas 76102
>
> 817.420.8261 *direct*
>
>
>
> **From:** Kevin Yu <kevin.yu93@gmail.com>
> **Sent:** Monday, December 7, 2020 5:10 PM
> **To:** Tony Diab <tony@coastprocessing.com>; Allen, Ben <ballen@winstead.com>; Rosell, Andrew <arosell@winstead.com>; Adam Blum <AdamBlum@aol.com>
> **Subject:** Discussion of entity type and domicile
>
> Hi Tony,
>
> Wanted to connect y'all to our counsel at Winstead and set up a call sometime this week to discuss what entity type and state to set up our PurchaseCo.
>
> If everybody could toss out some potential times, we can get something on the calendar. Thanks.

OHPLPG00073205

Kevin Yu

kevin.yu93@gmail.com

(512) 888-8897

---

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

--

Coast Processing

1351 Calle Avanzado

Suite 2

San Clemente, CA 92673

949.229.6262, ext. 1013

tony@coastprocessing.com

--

Coast Processing

1351 Calle Avanzado

Suite 2

San Clemente, CA 92673

949.229.6262, ext. 1013

tony@coastprocessing.com

--

Coast Processing

1351 Calle Avanzado

Suite 2

San Clemente, CA 92673

949.229.6262, ext. 1013

OHPLPG00073206

tony@coastprocessing.com

--

Coast Processing

1351 Calle Avanzado

Suite 2

San Clemente, CA 92673

949.229.6262, ext. 1013

tony@coastprocessing.com

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

OHPLPG00073207

Message

| | |
|---|---|
| **From:** | Tony Diab [tony@coastprocessing.com] |
| **on behalf of** | Tony Diab <tony@coastprocessing.com> [tony@coastprocessing.com] |
| **Sent:** | 12/16/2020 12:21:20 AM |
| **To:** | Rosell, Andrew [arosell@winstead.com] |
| **CC:** | Kevin Yu [kevin.yu93@gmail.com]; Allen, Ben [ballen@winstead.com]; Adam Blum [AdamBlum@aol.com]; Dyer, Trip [pdyer@winstead.com] |
| **Subject:** | Re: Discussion of entity type and domicile |

Hi Andrew -

We are ok with a DE corporation, please forward the term sheet for approval and we can then draft the operating agreement.  If you have a draft operating agreement for the new entity please forward for review.

Thanks!

On Tue, Dec 15, 2020 at 1:58 PM Rosell, Andrew <arosell@winstead.com> wrote:

> Tony – A Delaware entity that is not located in Delaware does not pay Delaware state tax.  The entity will have annual fees to pay to maintain its status as an entity, but this is true in Nevada also (and every other state).
>
> Our preference is Delaware.  Can you confirm the above with your counsel so you can be comfortable with Delaware and then we can proceed.  I think this is more efficient than a phone call.
>
> Thanks,
>
> Andrew
>
> **Andrew J. Rosell,** Shareholder
> Winstead PC  |  300 Throckmorton Street, Suite 1700  |  Fort Worth, Texas 76102
> 817.420.8261 *direct*
>
> **From:** Tony Diab <tony@coastprocessing.com>
> **Sent:** Tuesday, December 15, 2020 2:52 PM
> **To:** Kevin Yu <kevin.yu93@gmail.com>
> **Cc:** Rosell, Andrew <arosell@winstead.com>; Allen, Ben <ballen@winstead.com>; Adam Blum <AdamBlum@aol.com>
> **Subject:** Re: Discussion of entity type and domicile
>
> I am free any time after 2:30 pm Pacific today, or after 11:00 am Pacific tomorrow.
>
> 620-474-0301

EXHIBIT 521

OHPLPG00073208

Thanks!

On Tue, Dec 15, 2020 at 12:04 PM Kevin Yu <kevin.yu93@gmail.com> wrote:

Hey Tony,

Sorry for the delayed response, trying to get Winstead's availability as well so we can knock this all out in one go. What times work best for you today and/or tomorrow at this point?

Kevin Yu

kevin.yu93@gmail.com

(512) 888-8897

On Mon, Dec 14, 2020 at 11:34 PM Tony Diab <tony@coastprocessing.com> wrote:

Hi Kevin -

There is no aversion to Delaware.  That jurisdiction is typically sought by entities that are or might someday be traded on an exchange.  For obvious reasons that can never happen with the entity we are creating.  The advantages to DE are otherwise non-existent from my perspective, but I am open to any jurisdiction to be honest.  We are most comfortable with NV where we know the laws and also have no state income tax, but we would consider any jurisdiction in which we could qualify to state income tax avoidance.  I think a phone call makes sense, what is a good time to speak tomorrow?

Thanks!

On Mon, Dec 14, 2020 at 2:42 PM Kevin Yu <kevin.yu93@gmail.com> wrote:

Hi Tony,

Following up on my text message. Give me a call when you have a chance. Just wanted to see if there was any further context to the venue preferences, and in particular, you could better articulate the preference to avoid Delaware. Again, I'm sure it's our lawyers making sure all of our bases are covered, they just thought it was a bit strange as Delaware has generally been our de facto venue and we haven't previously experienced much pushback.

Thanks,

Kevin Yu

kevin.yu93@gmail.com

(512) 888-8897


On Thu, Dec 10, 2020 at 4:28 PM Tony Diab <tony@coastprocessing.com> wrote:

Hi Kevin -


Our preference is a Nevada LLC if we are going the LLC route.  In Texas, we would prefer a corporation.  We prefer to avoid Delaware.


Thanks!


On Thu, Dec 10, 2020 at 2:00 PM Kevin Yu <kevin.yu93@gmail.com> wrote:

Hey Tony,


Quick update, I believe our counsel is familiarizing themselves with Nevada laws to make sure everyone's interests are equally protected. In the meantime, do I remember correctly that y'all would be open to a Texas LLC as well? Our counsel is definitely more familiar with Texas than Nevada so that'd greatly speed up their due diligence and be our preference if Delaware doesn't work for y'all.


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


On Tue, Dec 8, 2020 at 12:11 AM Tony Diab <tony@coastprocessing.com> wrote:

Hi Andrew -


C corporations have formal shareholder rights which offer greater protection to the interested parties.  We are happy to proceed with a Nevada LLC based on our familiarity, but in any other state we would want a C corporation to ensure greater protection of Brian and Asante's rights as (majority) shareholders.  Would you be open to a Nevada LLC?  Asante has property in Nevada and spends enough time to qualify as a Nevada resident, and BAT LLC, a Nevada limited liability company, has already been formed.


Thanks!


On Mon, Dec 7, 2020 at 3:25 PM Rosell, Andrew <arosell@winstead.com> wrote:

Tony,

OHPLPG00073210

It might be more efficient for your counsel and you to email the basic rationale for a c-corp.  Given the tax cost associated with c-corp status, the rationale for a c-corp isn't immediately apparent.


Thanks,


Andrew



**Andrew J. Rosell,** Shareholder

Winstead PC  |  300 Throckmorton Street, Suite 1700  |  Fort Worth, Texas 76102

817.420.8261 *direct*



**From:** Kevin Yu <kevin.yu93@gmail.com>
**Sent:** Monday, December 7, 2020 5:10 PM
**To:** Tony Diab <tony@coastprocessing.com>; Allen, Ben <ballen@winstead.com>; Rosell, Andrew <arosell@winstead.com>; Adam Blum <AdamBlum@aol.com>
**Subject:** Discussion of entity type and domicile

Hi Tony,

Wanted to connect y'all to our counsel at Winstead and set up a call sometime this week to discuss what entity type and state to set up our PurchaseCo.

If everybody could toss out some potential times, we can get something on the calendar. Thanks.



Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

---

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

--

Coast Processing

1351 Calle Avanzado

Suite 2

San Clemente, CA 92673

949.229.6262, ext. 1013

tony@coastprocessing.com

--

Coast Processing

1351 Calle Avanzado

Suite 2

San Clemente, CA 92673

949.229.6262, ext. 1013

tony@coastprocessing.com

--

Coast Processing

1351 Calle Avanzado

Suite 2

San Clemente, CA 92673

949.229.6262, ext. 1013

tony@coastprocessing.com

--

Coast Processing

1351 Calle Avanzado

Suite 2

San Clemente, CA 92673

949.229.6262, ext. 1013

tony@coastprocessing.com

OHPLPG00073212

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

OHPLPG00073213

Message

| | |
|---|---|
| **From**: | Tony Diab [tony@coastprocessing.com] |
| on behalf of | Tony Diab <tony@coastprocessing.com> [tony@coastprocessing.com] |
| **Sent**: | 12/15/2020 8:51:36 PM |
| **To**: | Kevin Yu [kevin.yu93@gmail.com] |
| **CC**: | Rosell, Andrew [arosell@winstead.com]; Allen, Ben [ballen@winstead.com]; Adam Blum [AdamBlum@aol.com] |
| **Subject**: | Re: Discussion of entity type and domicile |

I am free any time after 2:30 pm Pacific today, or after 11:00 am Pacific tomorrow.

620-474-0301

Thanks!

On Tue, Dec 15, 2020 at 12:04 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hey Tony,

Sorry for the delayed response, trying to get Winstead's availability as well so we can knock this all out in one go. What times work best for you today and/or tomorrow at this point?

Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

On Mon, Dec 14, 2020 at 11:34 PM Tony Diab <tony@coastprocessing.com> wrote:
Hi Kevin -

There is no aversion to Delaware. That jurisdiction is typically sought by entities that are or might someday be traded on an exchange. For obvious reasons that can never happen with the entity we are creating. The advantages to DE are otherwise non-existent from my perspective, but I am open to any jurisdiction to be honest. We are most comfortable with NV where we know the laws and also have no state income tax, but we would consider any jurisdiction in which we could qualify to state income tax avoidance. I think a phone call makes sense, what is a good time to speak tomorrow?

Thanks!

On Mon, Dec 14, 2020 at 2:42 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hi Tony,

Following up on my text message. Give me a call when you have a chance. Just wanted to see if there was any further context to the venue preferences, and in particular, you could better articulate the preference to avoid Delaware. Again, I'm sure it's our lawyers making sure all of our bases are covered, they just thought it was a bit strange as Delaware has generally been our de facto venue and we haven't previously experienced much pushback.

Thanks,

EXHIBIT 522

OHPLPG00073214

Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

On Thu, Dec 10, 2020 at 4:28 PM Tony Diab <tony@coastprocessing.com> wrote:
Hi Kevin -

Our preference is a Nevada LLC if we are going the LLC route.  In Texas, we would prefer a
corporation.  We prefer to avoid Delaware.

Thanks!

On Thu, Dec 10, 2020 at 2:00 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hey Tony,

Quick update, I believe our counsel is familiarizing themselves with Nevada laws to make sure everyone's
interests are equally protected. In the meantime, do I remember correctly that y'all would be open to a
Texas LLC as well? Our counsel is definitely more familiar with Texas than Nevada so that'd greatly speed
up their due diligence and be our preference if Delaware doesn't work for y'all.

Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

On Tue, Dec 8, 2020 at 12:11 AM Tony Diab <tony@coastprocessing.com> wrote:
Hi Andrew -

C corporations have formal shareholder rights which offer greater protection to the interested parties.  We
are happy to proceed with a Nevada LLC based on our familiarity, but in any other state we would want a
C corporation to ensure greater protection of Brian and Asante's rights as (majority) shareholders.  Would
you be open to a Nevada LLC?  Asante has property in Nevada and spends enough time to qualify as a
Nevada resident, and BAT LLC, a Nevada limited liability company, has already been formed.

Thanks!

On Mon, Dec 7, 2020 at 3:25 PM Rosell, Andrew <arosell@winstead.com> wrote:
Tony,

It might be more efficient for your counsel and you to email the basic rationale for a c-corp.  Given the tax cost
associated with c-corp status, the rationale for a c-corp isn't immediately apparent.

Thanks,

Andrew

**Andrew J. Rosell,** Shareholder

Winstead PC  |  300 Throckmorton Street, Suite 1700  |  Fort Worth, Texas 76102

817.420.8261 *direct*

**From:** Kevin Yu <kevin.yu93@gmail.com>
**Sent:** Monday, December 7, 2020 5:10 PM
**To:** Tony Diab <tony@coastprocessing.com>; Allen, Ben <ballen@winstead.com>; Rosell, Andrew
<arosell@winstead.com>; Adam Blum <AdamBlum@aol.com>
**Subject:** Discussion of entity type and domicile

Hi Tony,

Wanted to connect y'all to our counsel at Winstead and set up a call sometime this week to discuss what
entity type and state to set up our PurchaseCo.

If everybody could toss out some potential times, we can get something on the calendar. Thanks.

Kevin Yu

kevin.yu93@gmail.com

(512) 888-8897

---

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the
reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly
prohibited. If you have received this communication in error, please immediately notify us by telephone.

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

--
Coast Processing
1351 Calle Avanzado

Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

OHPLPG00073217

Message

| | |
|---|---|
| **From**: | Kevin Yu [kevin.yu93@gmail.com] |
| on behalf of | Kevin Yu <kevin.yu93@gmail.com> [kevin.yu93@gmail.com] |
| **Sent**: | 12/15/2020 8:04:44 PM |
| **To**: | Tony Diab [tony@coastprocessing.com]; Rosell, Andrew [arosell@winstead.com]; Allen, Ben [ballen@winstead.com]; Adam Blum [AdamBlum@aol.com] |
| **Subject**: | Re: Discussion of entity type and domicile |

Hey Tony,

Sorry for the delayed response, trying to get Winstead's availability as well so we can knock this all out in one go. What times work best for you today and/or tomorrow at this point?

Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

On Mon, Dec 14, 2020 at 11:34 PM Tony Diab <tony@coastprocessing.com> wrote:

Hi Kevin -

There is no aversion to Delaware. That jurisdiction is typically sought by entities that are or might someday be traded on an exchange. For obvious reasons that can never happen with the entity we are creating. The advantages to DE are otherwise non-existent from my perspective, but I am open to any jurisdiction to be honest. We are most comfortable with NV where we know the laws and also have no state income tax, but we would consider any jurisdiction in which we could qualify to state income tax avoidance. I think a phone call makes sense, what is a good time to speak tomorrow?

Thanks!

On Mon, Dec 14, 2020 at 2:42 PM Kevin Yu <kevin.yu93@gmail.com> wrote:

Hi Tony,

Following up on my text message. Give me a call when you have a chance. Just wanted to see if there was any further context to the venue preferences, and in particular, you could better articulate the preference to avoid Delaware. Again, I'm sure it's our lawyers making sure all of our bases are covered, they just thought it was a bit strange as Delaware has generally been our de facto venue and we haven't previously experienced much pushback.

Thanks,

Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897

On Thu, Dec 10, 2020 at 4:28 PM Tony Diab <tony@coastprocessing.com> wrote:

Hi Kevin -

EXHIBIT 523

OHPLPG00073218

Our preference is a Nevada LLC if we are going the LLC route. In Texas, we would prefer a corporation. We prefer to avoid Delaware.

Thanks!

On Thu, Dec 10, 2020 at 2:00 PM Kevin Yu <kevin.yu93@gmail.com> wrote:
Hey Tony,

Quick update, I believe our counsel is familiarizing themselves with Nevada laws to make sure everyone's interests are equally protected. In the meantime, do I remember correctly that y'all would be open to a Texas LLC as well? Our counsel is definitely more familiar with Texas than Nevada so that'd greatly speed up their due diligence and be our preference if Delaware doesn't work for y'all.


Kevin Yu
kevin.yu93@gmail.com
(512) 888-8897


On Tue, Dec 8, 2020 at 12:11 AM Tony Diab <tony@coastprocessing.com> wrote:
Hi Andrew -

C corporations have formal shareholder rights which offer greater protection to the interested parties. We are happy to proceed with a Nevada LLC based on our familiarity, but in any other state we would want a C corporation to ensure greater protection of Brian and Asante's rights as (majority) shareholders. Would you be open to a Nevada LLC? Asante has property in Nevada and spends enough time to qualify as a Nevada resident, and BAT LLC, a Nevada limited liability company, has already been formed.

Thanks!

On Mon, Dec 7, 2020 at 3:25 PM Rosell, Andrew <arosell@winstead.com> wrote:

Tony,


It might be more efficient for your counsel and you to email the basic rationale for a c-corp. Given the tax cost associated with c-corp status, the rationale for a c-corp isn't immediately apparent.


Thanks,


Andrew



**Andrew J. Rosell,** Shareholder

Winstead PC | 300 Throckmorton Street, Suite 1700 | Fort Worth, Texas 76102
817.420.8261 *direct*

**From:** Kevin Yu <kevin.yu93@gmail.com>
**Sent:** Monday, December 7, 2020 5:10 PM
**To:** Tony Diab <tony@coastprocessing.com>; Allen, Ben <ballen@winstead.com>; Rosell, Andrew <arosell@winstead.com>; Adam Blum <AdamBlum@aol.com>
**Subject:** Discussion of entity type and domicile

Hi Tony,

Wanted to connect y'all to our counsel at Winstead and set up a call sometime this week to discuss what entity type and state to set up our PurchaseCo.

If everybody could toss out some potential times, we can get something on the calendar. Thanks.

Kevin Yu

kevin.yu93@gmail.com

(512) 888-8897

---

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastproccessing.com

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

OHPLPG00073220

--
Coast Processing
1351 Calle Avanzado
Suite 2
San Clemente, CA 92673
949.229.6262, ext. 1013
tony@coastprocessing.com

OHPLPG00073221